## ADOPTION OF GRETA.

Suffolk. January 6, 2000. - May 18, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, IRELAND, & COWIN, JJ.

*Parent and Child,* Adoption, Dispensing with parent's consent to adoption.
*Adoption,* Dispensing with parent's consent, Visitation rights. *Minor,* Adop-
tion, Visitation rights.

In a proceeding to dispense with parental consent to adoption, there was clear
and convincing evidence of the mother's unfitness, and the judge properly
concluded that it was in the child's best interests to be adopted in ac-
cordance with the plan of the Department of Social Services. [583-588]
COWIN, J., concurring, with whom LYNCH, J., joined.

In a proceeding to dispense with parental consent to adoption, the judge erred
in providing for postadoption visitation, where he concluded that there was
no significant relationship or bond between the child and her biological
mother. [588-589] COWIN, J., concurring, with whom LYNCH, J., joined.

PETITION filed in the Suffolk Division of the Probate and Fam-
ily Court Department on April 18, 1995.

The case was heard by *Jeremy A. Stahlin,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Virginia A. Peel,* Special Assistant Attorney General, for
Department of Social Services.

*David A.F. Lewis* for the mother.

*Dawn E. LiVigne,* for the child, submitted a brief.

MARSHALL, C.J. This appeal arises from the granting of a peti-
tion of the Department of Social Services (department or DSS)
to dispense with parental consent to adoption of a child, whom
we shall call Greta, pursuant to G. L. c. 210, § 3.[1] Born in
December, 1992, Greta is now seven years old. She has lived

[1]This case and *Adoption of Vito, ante* 550 (2000), were paired for argument
in this court. Certain arguments of the parties common to both of the cases are
addressed in the case where the discussion is most appropriate.

The amici, The Home for Little Wanderers, Inc., and Massachusetts Apple-
seed Center for Law and Justice, requested that this court consider for this

with her foster mother (also her preadoptive mother) since she was six days old.

As part of his December 31, 1997, termination decree, the probate judge provided for postadoption visitation twice each year between Greta and the biological mother, if she requests it through the department or its contractor. The judge also required the department (1) to screen the mother before each visit to make sure she is in a suitable mental condition, and (2) to provide a place for the visit, as well as a person to supervise the visit, if requested by the adoptive parent.

The mother and the department cross-appeal from the judgment.[2] The mother's appeal concerns aspects of the finding of her unfitness she asserts were improperly related to her decision not to take psychotropic (antipsychotic) medications as prescribed. The department's appeal disputes the judge's requirements for postadoption visitation between the mother and Greta. We transferred the case from the Appeals Court on our own motion.

We affirm so much of the judge's decree as dispenses with parental consent to the adoption of Greta, but vacate the judge's orders concerning postadoption visitation because there was insufficient evidence of a significant bond between the mother and Greta, and no findings providing other compelling reasons to support a conclusion that postadoption visitation is currently in the child's best interest.

I

The probate judge found the following facts. On December 19, 1992, four days after Greta's birth, the mother reportedly telephoned the police thinking that someone was breaking into her apartment. Responding to her call, the police found the

case their amicus briefs submitted in *Adoption of Lars, post* 1151 (2000), which we have done.

[2]Counsel for Greta filed briefs arguing that the department met its burden of proving parental unfitness, that the Department of Social Services (DSS) could be ordered to provide the child postadoption services, and that the judge's finding that Greta's best interests would be served by postadoption visitation was supported by the evidence, but that the judge erred in not making a provision for the adoptive mother to exercise discretion regarding allowing visitation.

mother alone in her apartment with Greta, her newborn infant.[3] While officers were at her home, they noticed two bottles of baby formula in the home "and nothing else." They noted that the mother was "a little out of it."[4] The mother was transported to Brigham and Women's Hospital, where she became "nonverbal . . . and almost catatonic." A doctor from the hospital's psychiatry department informed social workers that the mother was not competent to consent to have a friend take the child or to agree to the child's placement with the department.[5]

On December 21, 1992, the department commenced a care and protection proceeding, a judge granted temporary custody to the department, and the department placed the child in the custody of her foster mother. The child has remained in her foster mother's home since that time. On August 4, 1993, the Boston Juvenile Court found the mother unfit and committed the child to permanent DSS custody.

The department's initial assessment, completed in February, 1993, concluded that, if the mother were stable and taking her medication, she would do a fine job of caring for the child's needs, that she had the ability to call for help during a crisis as she had done in the past, but that she needed to be followed regularly by a psychiatrist and needed the assistance of a parent aide. The Department of Mental Health (DMH), which has also had ongoing involvement with the mother, provided the mother with a service plan that recommended a supportive housing arrangement and a rehabilitative day program.[6] In supportive

---

[3]The mother has two other children, one born before Greta and one born after her. The eldest was removed from the mother's custody and was not at home. The youngest, born shortly before the trial commenced, was placed in DSS custody several months after his birth, before the trial had concluded. Those children are not involved in this appeal. Greta's father is also not involved in this appeal.

[4]The mother, who has a history of schizophrenia, was hospitalized twenty-nine times for agitated, aggressive, and psychotic behavior between 1988 and 1992.

[5]There was evidence, however, that the mother had called a friend on December 19, 1992, sometime prior to calling the police. The mother allegedly told her friend that she was having some problems, and she asked if the friend would watch the child if anything happened. The friend accompanied the mother to the hospital, and the department initially decided to place the child with the mother's friend.

[6]DSS service plans for the mother typically called for her to maintain contact with the Department of Mental Health (DMH) and to adhere to its

housing the mother would live with other DMH clients in a structured residence, could come and go, but would be supervised regarding taking her medications and any other medical problems that might arise. The mother never agreed to live in the supportive housing arrangement; she did attend the day program for a brief time.

A DMH psychiatrist prescribed Prolixin, a psychotropic medication, for the mother and arranged for a nurse to go to the mother's home and administer her medications, which the mother allowed for a time. The mother was admitted to a hospital in February, 1993, due to an adverse reaction to one of her medications. She was hospitalized in March and April of 1993 after she failed to take her medication as directed by her psychiatrist. In June, 1993, she was arrested for an incident involving violent and explosive behavior.

In February, 1993, DSS prepared a service plan for the mother for the period February 1, 1993, to August 31, 1993, and prepared subsequent plans thereafter.[7] The goal of these plans initially was not adoption of Greta, but by the June, 1994, service plan the goal had been changed to adoption.[8] We discuss the service plans and DSS review of the mother's compliance with those plans in more detail in Part II, below.

The February, 1993, and December, 1993, DSS service plans called for the mother to be available for a weekly, one-hour supervised visit with Greta, among other requirements. DSS changed the visitation from weekly to monthly in February, 1994. Service plans called on the mother to read and play with Greta and to take only one cigarette break during her visits. Pursuant to the December, 1996, service plan, the mother was to participate in parent-aide services through DSS. Department reviewers often found the mother to be in only partial compliance with the plans.

From 1995 to 1997, the mother continued to reject the department's referrals for various services, such as a parenting-

recommendations.

[7]At trial, six DSS service plans, covering the period from February 1, 1993, to June 1, 1997, with one gap in 1993, were entered in evidence. Similarly, six departmental reviews were entered in evidence. We recount details of the service plans and the reviews based both on the judge's findings and on the exhibits.

[8]According to the judge's findings, in June, 1993, DSS conducted a permanency planning conference and decided that the goal for Greta was adoption. It is unclear why the December, 1993, plan did not reflect this goal.

aide program, money management counselling, individual counselling with DMH, psychiatric counselling and monitoring, and home-based team intervention. The probate judge found:

"At some time in or around 1996, [the mother] stopped taking her anti-psychotic medication prescribed by her psychiatrist because she did not then, and does not now, believe that she needs to take it. Since being off the medication, [she] has been more animated, more communicative, and able to move around less slowly. She has been clear in her thinking since she stopped the medication, except for periods which arrive without warning when she must be hospitalized for psychiatric reasons."

She had two psychiatric admissions to a hospital between May 29 and June 30, 1997, the latter for approximately four days.

From February, 1994, until several months before the trial, visits between the mother and Greta occurred monthly. The judge found that the mother was "sedentary and passive at the visits and did not initiate activities"[9] ; that she "usually sat and smoked cigarettes and talked to the adults"; that she "never took the initiative to participate in activities which interested [Greta] such as playing a game or reading a book"; and that she "made little effort, if any, to improve the quality of the visitation . . . over the course of the past several years." The judge also found that the mother had a "serious lack of understanding of" feelings Greta would have generally, and a lack of "capacity to deal with" the feelings Greta would have if she were removed from her foster home and reunited with the mother; and further, that the mother had expressed her feelings to the child about the situation which, while understandable, were not appropriate to express to a child. The judge found that the mother "is a warm, affectionate, nurturing person who is interested in [Greta] and is interested in stimulating [her] intellectual growth. While she may have the capacity to provide minimally for [Greta's] physical needs in between psychiatric hospitalizations, her interest . . . does not extend to making even the smallest of effort or sacrifice to transform the interest into action."

At one visit, the guardian ad litem observed that Greta did

_____

[9]A psychologist appointed by the court as a guardian ad litem attended several of the visits. The guardian ad litem's report was entered in evidence.

not want to stay in the room with the mother and the guardian ad litem, cried about having to participate in the visit, and wanted to be in another room with the other children in the foster family. In other visits, however, the mother was appropriate with the child who appeared comfortable with her, sometimes welcoming her mother with a kiss. Greta does not inquire about her mother between visits, nor ask to telephone her mother. The mother stopped visiting the child near the time the trial in this case began and no longer telephones her.

In contrast, the judge found the relationship between Greta and her foster mother to be "very close and loving." He found Greta is "very bonded" with the foster mother, who has cared for Greta since she was six days old. When the biological mother asked Greta if she wanted to come and live with her, Greta replied that she wanted to stay where she was with her "mommy."[10] The judge found that the foster mother "is [Greta's] psychological mother, the person with whom she has the strongest psychological tie, and removing [Greta] from [the foster mother] would have a deep, negative effect on [Greta]."

The judge found by clear and convincing evidence that the mother is currently unfit to parent Greta and that it is in Greta's best interests to be adopted in accordance with the plan of the department. The judge stated that he had considered all of the mandatory statutory factors enumerated in G. L. c. 210, § 3 (c), to be considered in granting a petition to dispense with consent to adoption, citing § 3 (c) (iii), (iv), (vi), (vii), (x), and (xii) as relevant.[11]

The judge concluded: "Despite [the mother's] serious

---

[10]In contrast, Greta refers to her biological mother by her first name.

[11]In considering these factors, the judge found:

"iii. [and x.] . . . [the mother] has not called [Greta] since the trial began and . . . has not visited since she was hospitalized in May of 1997.

"iv. . . . DSS has offered [the mother] services intended to correct the circumstances that led to the custody order, [she] has either declined or been unable to effectively use the services, and [Greta] cannot be returned to her.

"vi. [The mother] is unable to understand [Greta's] feelings or emotional needs, would be unable to meet those needs if [Greta] were placed in her care, and there is no reasonable expectation that she will

shortcomings, she is a person who visited with [Greta] for most of Greta's life until some time earlier this year, and [she] will continue to know intellectually that [the mother] is her birth mother. For that reason, provided that [the mother] is able to behave appropriately, it will be in [Greta's] best interests to see [the mother] in a supervised visit twice a year to know that [the mother] is alright." He found that the foster mother would be willing to allow a social worker to take [Greta] to supervised visits with the mother. The foster mother believes the mother's behavior is too unpredictable and no longer wishes to have direct contact with her.[12]

## II

We first address the issues raised by the mother. She argues that the department's condition that she receive treatment with antipsychotic medication is unsupported as medically necessary and was required without judicial approval in violation of art. 12 of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution. She asserts that DSS service plans gave her the "Hobson's choice" of taking antipsychotic medications or losing her ability to reunite with her child. She claims that DSS should receive prior

---

be able to do so in the future.

"vii. . . . [Greta] has formed a strong, positive bond with [the foster mother], the only parent figure [Greta] has known since she was 6 days of age. Forced removal of Greta from [the foster mother] would cause serious psychological harm to [Greta], [the mother] would be unable to meet the emotional needs of [Greta] on such removal, and [the mother] would be unable to meet [Greta's] physical needs on the occasions of her unpredictable, involuntary psychiatric hospitalizations. . . . [The mother] has declined to accept services offered by both DSS and DMH, and she has not made any serious effort to build a relationship with [Greta] during visits scheduled for her benefit.

"xii. [The mother's] mental illness leaves her unable to provide at all for [Greta's] emotional needs and, at best, leaves her only sporadically able to provide minimally for her physical needs. There is no reasonable expectation that she will be able to do so in the future."

[12]The judge found that the foster mother received a telephone call in May, 1997, from the mother and someone claiming to be the child's godmother in which the mother said to the foster mother, "You snooty bitch. You don't talk to me when you see me. They already took one of my kids. They're not taking another one." The call ended with the godmother telling the foster mother, "I know where you live."

judicial authorization to require that a competent parent take an-tipsychotic medication as a condition to being reunited with his or her child.[13] She argues that DSS's presumptions were specula-tive and improperly shifted the burden, and therefore the judge's conclusion of unfitness is unsupported by clear and convincing evidence.[14]

We agree that a departmental requirement, unsupported by prior judicial authorization, for a parent to take psychotropic drugs to comply with a service plan having a bearing on termination, custody, or visitation, potentially raises serious concerns. See *Acting Superintendent of Bournewood Hosp.* v. *Baker, ante* 101, 106 (2000); *Guardianship of Roe,* 411 Mass. 666, 672 (1992), quoting *Guardianship of Weedon,* 409 Mass. 196, 199 (1991) (person has right to refuse invasive and potentially harmful medical treatment such as administration of antipsychotic drugs). Cf. *Guardianship of Linda,* 401 Mass. 783, 787 (1988), quoting *Rogers* v. *Commissioner of the Dep't of Mental Health,* 390 Mass. 489, 501-502 (1983) (court ap-proval required before forcible medication of incompetent patient with antipsychotic drugs in nonemergency situation can occur; State may invoke police powers forcibly to administer antipsychotic drugs without prior judicial approval where patient poses imminent threat of harm to self or others and there is no less intrusive alternative). But the mother's argument seems premised on an assumption that (1) departmental assessments of her unfitness or noncompliance with service plans centered on her refusal to take psychotropic medications, and (2) the judge based his determination of unfitness largely on DSS's negative

---

[13]At points the mother frames her argument in terms of a dispute with DSS conditions and presumptions, which we interpret as a dispute with the findings and conclusions made by the judge, because the judge concluded: "DSS has proven . . . that [the mother] is currently unfit to parent [Greta] . . . [and] . . . that it is in [Greta's] best interests to be adopted."

[14]The mother points to evidence suggesting that she did well during certain periods when not on medication, that her thinking was clearer without it, that DMH found her apartment "very neat" and provisioned with food, that she seemed to be budgeting her extremely limited income acceptably without departmental help, and that her conduct was appropriate during the guardian ad litem's interviews with her and her daughter. Given the numerous counter-vailing reasons for the judge's finding of unfitness, we are not convinced that it was clearly erroneous. See *Adoption of Kimberly,* 414 Mass. 526, 528-529 (1993), citing *Care & Protection of Martha,* 407 Mass. 319, 327 (1990). See also *Adoption of Quentin,* 424 Mass. 882, 886 (1997), quoting *Custody of Eleanor,* 414 Mass. 795, 799 (1993).

assessments assertedly due to her failure to take the medications. Neither assumption withstands close scrutiny.

In the "Updates" section of one DSS service plan, December, 1993, the department indeed expressly called on the mother to "[t]ake medication." But in the task lists of other service plans over the years, the department always discussed the mother's medications in terms of adhering to the recommendations of the psychiatrist, doctor, or DMH worker, without indicating any direct departmentally mandated requirement for her to take certain medications. Significantly, sometime in 1996 the mother stopped taking her antipsychotic medication, and the December, 1996, service plan did not mention medications at all in its list of the mother's tasks, but only, more generally, her "treatment."

Once, in an early review, a DSS reviewer indirectly associated the mother's noncompliance with the plans with her failure to take medication.[15] The DSS reviews, however, were much more often concerned with other issues concerning the mother's conduct or noncompliance with the service plans, including, significantly, her conduct toward Greta.[16]

As to the second implicit assumption, the judge's rationale

---

[15]In the July, 1993, foster care review report, the DSS case reviewer wrote:

"[The mother] has been diagnosed to be suffering from schizophrenia. . . . Her medication is being monitored by a psychiatrist. . . . [She] has, however, not complied with her medication prescription and, as a resul[t] has decompensated and has had to be hospitalized a number of times. . . . [She] has partially complied with her service plan tasks . . . but has not followed through with her psychiatric treatment recommendations. . . . There has been insufficient progress toward the achievement of the permanent goal of returning [Greta] to her mother's care. This has been because of [the mother's] failure to follow through with her psychiatric treatment recommendations . . . ."

[16]The June, 1995, foster care review report concluded, for example, that the mother had only partially completed her service plan tasks as she continued to have difficulty interacting appropriately with Greta during visits. The December, 1995, review likewise determined that the mother had only partially completed her service plan tasks, noting she was not in therapy. The review separately noted that her interaction with Greta during visits was minimal. The June, 1996, review again determined that the mother had only partially completed her service plan tasks, noting she had refused to enter therapy or a DMH supportive living program, and did not participate in a parenting program or work on budgeting to ensure money for transportation to visits. The report also separately stated that she reportedly had difficulty interacting

for his ultimate conclusions relies heavily on other issues besides the mother's failure to take psychotropic medications. Similarly, in his review of the statutorily required factors, see note 11, *supra*, the judge discussed numerous parental shortcomings unrelated to failure to take medication. In his rationale, the judge noted a variety of circumstances supporting his judgment, including the mother's psychiatric hospitalizations, her decision to stop taking medications, and her rejection of the offer of supportive living and other assistance programs. Her rejection of supportive services bore particularly on the mother's resulting inability to provide safely for her daughter's minimum physical needs.[17] The judge's rationale implies that a supportive living program might have compensated in part for the failure to take medications, allowing the mother to avoid hospitalization, but that the mother both rejected the supportive living program and did not take her medication, leaving her daughter at considerable risk.

Moreover, the mother's failure to accept assistance from other programs, and her inability to understand and prioritize her daughter's emotional needs, factor prominently in the judge's rationale for the decree. Cf. *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 764 (1998) (ultimate finding of parental unfitness not supported where DSS conviction was "no [psy-

---

with Greta and discussed inappropriate topics with her. In this, the latest review before trial entered in evidence, there was no compliance issue concerning medication, and in fact, the reviewer noted that the mother was taking her medication. Other reviews found her in compliance with the plan or were unable to assess compliance for departmental reasons.

[17]The judge's rationale, in relevant part stated:

"In 1996, [the mother] decided, against her psychiatrist's advice, to stop taking her medications with the result that, although she was more animated and communicative and at times had clearer thinking, she was subject to unpredictable periods during which she would need to be hospitalized for psychiatric reasons. The supportive living program offered to [her] by DMH, but declined, would have allowed her substantial independence while providing sufficient monitoring so that the need for hospitalization might be either anticipated and avoided, or else might be noticed early enough to avoid [her] having to be picked up by the police.

"Without such a program, and without parenting and other programs declined by [her], she is unable to safely provide for even the minimum physical needs of [Greta]."

chotropic] medication, no child," but where evidence was that mother took good care of child earlier and assessment of mother's current functioning as parent was missing). In our view, the judge properly focused on the best interests of a little girl who should not be forced intermittently to bear the brunt of her mother's illness due to the mother's rejection of sufficient support services to shield her child.

The mother also argues that DSS presumed that she was unfit to parent without antipsychotic medication, shifting the burden to the mother in violation of her due process rights under art. 12 and the Fourteenth Amendment, that the judge "did not find that [the mother's] decision to [forgo] antipsychotic medication would inevitably result in child abuse and neglect," and his conclusion of unfitness is unsupported by clear and convincing evidence. As just discussed, however, DSS presented evidence of a wide variety of problems with the mother. Her failure to take psychotropic medications is but one. We see little evidence that DSS presumed her unfitness based principally on failure to take the medications. More importantly, the judge's rationale for his decree, and his assessment of the relevant statutory factors, were not centered on any presumed unfitness due to failure to take the medications.

In order to dispense with parental consent to adoption, pursuant to G. L. c. 210, § 3, "the judge must find, by clear and convincing evidence, that the parent is currently unfit to further the welfare and best interests of the child. . . . The judge's findings must be left undisturbed absent a showing that they are clearly erroneous." *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993), citing *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). See *Adoption of Quentin*, 424 Mass. 882, 886 (1997), quoting *Custody of Eleanor*, 414 Mass. 795, 799 (1993) (judge's assessment entitled to deference). "Parental unfitness . . . means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent. Rather, the idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.' " (Footnotes omitted.) *Adoption of Katharine*, 42 Mass. App. Ct. 25, 28 (1997), quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975). Here it was clear from the judge's careful and comprehensive findings and his rationale for the decree that his

judgment was not based simply on the handicap of the mother's periodic psychiatric problems, nor even on the effects of that handicap when not controlled by medication, but rather on a constellation of factors that pointed to termination as being in the best interests of the child. Cf. *Adoption of Quentin, supra* at 888 (when assessing parental fitness, it is not enough to state parent is mentally impaired, rather must show condition affects parent's ability to care for child). The judge's order granting the petition to dispense with parental consent to adoption was supported by clear and convincing evidence. See G. L. c. 210, § 3 (*b*), (*c*) (iii), (iv), (vi), (vii), (x), and (xii). See also *Adoption of Gwendolyn,* 29 Mass. App. Ct. 130, 134-136 (1990) (upholding termination where mother seriously disabled with chronic mental illness, refuses to accept medication or therapy, and child has well-established relationship and bonding with foster mother whom she calls "Mommy"); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. 965, 965-966 (1983) (rescript opinion) (upholding finding of mother's unfitness where, among other circumstances, mother lacked capacity to give physical and emotional support to child, seizure-prone mother failed to seek medical attention for her condition which, uncontrolled, was dangerous to child, and child had formed strong bonds in foster home).

## III

In its appeal the department claims that the judge erred in giving the mother the right to obtain postadoption visitation. In *Adoption of Vito, ante* 550, 557 (2000), we reiterated the equitable authority of a judge acting on a petition to dispense with consent to adoption pursuant to G. L. c. 210, § 3, to require postadoption contact, including visitation, currently in the best interests of the child.[18] We noted that a postadoption contact order "may be warranted where the evidence readily points to significant, existing bonds between the child and a biological parent, such that a court order abruptly disrupting that relationship would run counter to the child's best interests." *Adoption of Vito, supra* at 563, citing *Youmans* v. *Ramos,* 429 Mass. 774, 783, 785-786 (1999).

---

[18]In *Adoption of Vito, supra* at 556-560, we discuss in more detail the reasons why the exercise of this equitable authority is appropriate in such cases; we also discuss the lengthy historical precedent of acting in the best interests of a child when the child is properly under the court's jurisdiction.

Here, the judge found that "[t]here is no significant relationship to maintain" and "no observable bond" between Greta and her mother. There was little if anything to show that Greta's current interests would best be met by occasional visits with her mother. The judge stated that the purpose of any ongoing contact would be to address Greta's curiosity regarding her mother's welfare, to know that she is "alright." This is a legally insufficient basis upon which to order postadoption visitation, given that such visitation necessarily intrudes on the ordinary prerogatives of the adoptive family.[19] See *Adoption of Vito, supra* at 563-566. There is nothing to suggest that, if Greta is curious about her birth mother's well-being, the only mechanism for satisfying that curiosity is through twice yearly visits with the biological mother extending years into the future. Our decision, of course, is not meant to discourage a voluntary agreement between the biological mother and the adoptive mother for such visitation, pursuant to G. L. c. 210, § 6C.

The department also claims that the judge exceeded his authority when he ordered the department to facilitate postadoption contact. Because we conclude that the judge erred in providing for postadoption visitation in this case, we need not address this question.

For the foregoing reasons, the judge's order granting the petition to dispense with parental consent to adoption of Greta is affirmed in part. So much of the order as provides for the mother to obtain postadoption visitation is vacated. We remand the case to the Probate and Family Court Department and direct that the decree be modified consistently with this opinion.

*So ordered.*

Cowin, J. (concurring, with whom Lynch, J., joins). I concur in the result of the court, but reiterate the view expressed in my concurrence in *Adoption of Vito, ante* 550, 570-576 (2000), that

---

[19]Although it is noteworthy that the adoptive mother, the guardian ad litem, and the child all supported postadoption visitation of some type, this is not dispositive concerning an order for such visitation. If the adoptive mother believes that the welfare of her adoptive daughter would best be served by visits with the biological mother, but is unwilling to participate in or to arrange those visits, she can request assistance from the department. See 110 Code Mass. Regs. § 7.210 and commentary (1999).

the Probate Court does not have the authority to order posta-
doption visitation under the provisions of G. L. c. 210, §§ 3
and 6, and that it lacks the equitable authority to do so.