In November of 2016, the Department of Children and Families (department) filed a care and protection petition under G. L. c. 119, § 24, alleging that Anders was at risk of neglect by his mother.[3] After a trial in July of 2017, the judge adjudicated Anders, then six years old, in need of care and protection, finding that the department had proved by clear and convincing evidence that the mother was currently unfit. Both the mother and Anders appeal. We reverse.
Background. The judge made the following findings.[4] The mother, who was thirty-eight years old at the time of trial, has three children by different fathers. She graduated from high school, attended vocational school, and has maintained steady employment. When the mother was sixteen years old, she was involved in a serious car accident, causing her to sustain a brain injury. The maternal grandparents told the court investigator that, as a result of her brain injury, the mother "can't remember what happened and often behaves like she is stuck on age [sixteen]; hence, the bad decisions about who would father her children and her difficulty in setting boundaries and discipline for the boys."[5]
The department filed the underlying care and protection petition following a report that Anders was exhibiting serious behavioral issues and "had made sexualized comments resulting in a SAIN [Sexual Abuse Intervention Network] interview." Specifically, Anders had made the following comments regarding his uncle, the mother's brother: "I call my uncle big daddy" and "I get on all fours and he pisses up my a-hole." The mother admitted at trial that she told Anders and his brother not to mention their uncle's name during the SAIN interview; she acknowledged, however, that she should not have done so.[6]
The children were removed from the mother's care after the SAIN interview. Prior to their removal, Anders and his brother were always fighting and would sometimes become physical with each other. On one occasion a social worker observed them "throwing large boxes down the stairs, taking medication off the counter, and going in and out of the freezer." The social worker characterized the brother as the "main instigator." At that time Anders was attending therapy at the Brien Center on a weekly basis. The mother sought additional services for Anders after he was asked to leave a YMCA because of his alarming behavior.
After the children were removed, the mother cooperated with the department and complied with her service plan tasks, including working with a "parent-partner," visiting consistently with the children, and attending appointments with "ICC" and "Key Tracking."[7] The judge found, however, that there was still "a concern ... with [the] [m]other's ability to follow through with the services." The judge cited the following examples: (1) the mother was asked to post a list of home rules, which she did, but once it blew off the wall, she failed to hang it back up; (2) during visits she would redirect Anders when he engaged in bad behaviors and name calling, but did not impose "any discipline such as time outs or strict enforcement of the rules"; (3) she does not understand the importance of Key Tracking "but continues to do it because that is what she was told to do"; (4) she failed to follow through with signing up Anders's brother for a daycare slot and instead used his father as a daycare resource; (5) she failed to make the necessary telephone calls to maintain Anders on a waiting list for behavioral therapy ; and (6) she was not forthcoming with the department about her new boy friend, who had a number of unsupported G. L. c. 119, § 51A, reports filed against him. The judge also found that Anders has "a terrible swearing problem," which he "learned from hearing [the] mother speak that way."
Discussion. The judge's findings do not suffice to show that the department met its burden of proving parental unfitness by clear and convincing evidence. "Parental unfitness ... means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent. Rather, the idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.' " Adoption of Greta, 431 Mass. 577, 587 (2000), quoting from Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).
Here, the concerns regarding the mother's parenting abilities centered around her difficulties in managing Anders's behavioral issues. But those behavioral issues appeared to stem in large part from Anders's conflict with his brother, who was no longer living in the mother's home by the end of trial.[8] Furthermore, it is undisputed that, once the children were removed, the mother visited them consistently and complied with her service plan. In fact, the mother gave uncontested testimony that she was found in "full" compliance with her service plan at the last foster care review meeting. The few missteps committed by the mother do not establish by clear and convincing evidence that she is unfit. In so concluding, we do not mean to minimize the significance of some of these missteps. In particular, the judge was justifiably concerned by the mother's failure to follow through with maintaining Anders on a waiting list for behavioral therapy and her failure to disclose that her new boy friend, who had a potentially concerning history, was spending nights at her home. But those concerns were ameliorated by evidence that Anders was still going to the Brien Center for therapy on a weekly basis, and that the mother disclosed her boy friend's information upon request and complied with an emergency plan prohibiting him from coming to the home. As for the remaining concerns cited by the judge, it suffices to say that they do not rise to the level of "grievous shortcomings or handicaps" that put Anders's welfare at risk. Adoption of Greta, 431 Mass. at 587.
As the department notes, because this is not a termination of parental rights case, the judge's findings would not preclude reunification of Anders with the mother in the future. But even in a care and protection proceeding, the burden of proof on the department to prove current unfitness is "heavy." Care & Protection of Elaine, 54 Mass. App. Ct. 266, 271 (2002). "The requisite proof must be strong and positive; it must be 'full, clear and decisive.' " Ibid., quoting from Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997), S.C., 427 Mass. 582 (1998). The evidence here is insufficient to meet that high standard.
Judgment reversed.

The department also alleged that Anders's older sister and brother were in need of care and protection. A judge of the Juvenile Court dismissed the sister from the petition, and trial proceeded as to Anders and his brother only. After finding the mother currently unfit, the judge, acting on a motion of the brother's biological father, dismissed the brother from the petition because his father had filed a complaint for full custody in Probate and Family Court. Only the judgment regarding Anders is at issue in this appeal.

The mother and Anders contend that many of the judge's findings are clearly erroneous. The department more or less concedes that the judge clearly erred in finding that the "[m]other did not share the [department's] or the court's concerns with [Anders's hair-pulling] behavior." On the view we take of the case, we can assume, without deciding, that the remaining findings are not clearly erroneous.

A neuropsychologist evaluated the mother and concluded that, despite her brain injury, the mother is "quite bright," has no "deficits in judgment and reasoning," and any concern that "cognitive deficits... were interfering with her ability to accurately parent" would not be "justified." The judge did not mention the neuropsychologist's report in her findings.

The allegations of sexual abuse were ultimately unsupported.

According to the parties' briefs, "ICC" stands for intensive care coordination and is a program that facilitates care planning and coordination of behavioral health services, while "Key Tracking" is a program that provides various support services to families based on their individual needs. The record does not contain any of this information. The department also did not submit any service plans or foster care review reports in evidence.

On the second day of trial, the department reported that it had placed the brother with his biological father.