NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1229

ADOPTION OF CAMERON.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered in the Juvenile Court terminating her parental rights to her son, Cameron, who was born in May 2019.  Cameron appeals from the order granting the mother posttermination and postadoption visitation.[2]  We affirm the termination of the mother's parental rights and vacate the order for posttermination and postadoption visitation between the mother and Cameron.

Background.  At the time of removal, the mother and the putative father[3] (father) lived together with eight week old

---

[1] A pseudonym.

[2] The Department of Children and Families does not join Cameron's appeal of the visitation and instead notes that Cameron can return to the trial court and request a modification of that order.

[3] The judge treated the putative father as the biological father of Cameron for most of the case, but removed him from the case on March 3, 2020, after he failed to establish paternity. Cameron's legal father, as listed on his birth certificate, is the mother's former husband.  The legal father denied paternity, noting that he was abroad, serving in the military, at the time Cameron was conceived.  On May 8, 2021, the legal father was

Cameron and the father's two year old son, Kevin, and three year old daughter, Nora, from another relationship.

The mother and all three children came to the attention of the Department of Children and Families (department) on July 4, 2019, when Nora was admitted to the hospital with injuries to her genital area consistent with penetrative sexual assault, and the department received a G. L. c. 119, § 51A, report (51A report). The department filed a care and protection petition under G. L. c. 119, § 24, and was granted emergency temporary custody of Cameron and his half-siblings, Kevin and Nora. While there was no evidence that Cameron or Kevin had been abused, the department was concerned for the safety of all three of the children in the home.

The trial judge found that the events leading to the department's involvement unfolded in the following manner. On July 4, 2019, the mother fed the children lunch and put them down for a nap before leaving to run errands. Approximately ten to fifteen minutes later, the father sent a text message to the mother that Nora had been injured. The mother instructed the father to clean the wound and said she would be home soon to evaluate the situation. When the mother returned to the home

___

served in hand with a notice of the custody proceedings, but he did not appear at any hearings. His parental rights were terminated; he has not appealed.

2

approximately three minutes later, she found the father squatting over Nora, who was naked and bleeding from the vagina on the bathroom floor. The bleeding was so extensive that the mother had to wipe the area multiple times before she could see there was a substantial tear in Nora's vaginal opening.

Other than stating that he had found Nora upstairs "laying there bleeding," the father did not explain what happened. The mother did not call emergency services and left Cameron and Kevin in the father's care while she took Nora to the hospital. The father and the mother claimed that Nora had scratched herself in the genitals; however, hospital staff found dirt but no blood under Nora's fingernails.

That evening, the mother asked the father how Nora had been injured. The father stated that he did not know because he was outside mowing the lawn when the injury occurred. The mother did not go up to the second floor of the apartment or inspect Nora's room until after the police searched the apartment on July 5, 2019. The mother claimed she never saw any evidence of blood anywhere in the apartment other than on a towel in the bathroom.

On July 19, 2019, the mother told the department that she believed Nora's injuries were a "straddle injury" from falling on a railing while attempting to climb over her bed. The mother

3

claimed the injuries resulted from the father's negligent supervision.

On July 25, 2019, the father was arrested and, on October 17, 2019, was indicted on charges related to the alleged sexual abuse of Nora. The mother moved out of the home she had shared with the father and rented a room in the apartment house where the father's grandparents (great-grandparents) lived. The mother visited the father in jail and attended two or three of his court dates.

The department's concerns centered on the mother's ability to protect Cameron, considering the mother's inconsistent statements regarding how Nora was injured and her reluctance to believe the father had assaulted Nora even after he had been indicted. In conversations with the department social worker assigned to this case from July 2019 to January 2020, the mother continued to resist acknowledging that the father assaulted Nora, even when the social worker told the mother there was a medical report that confirmed Nora was sexually assaulted. In October 2019, the mother told the department social worker that, absent deoxyribonucleic acid (DNA) evidence, she would not believe the father had sexually assaulted Nora.

On August 12, 2019, the father was released on bail and placed on house arrest with a global positioning system monitor, and he moved in with the great-grandparents. Based on her

4

residence, the mother was required to walk by the father's apartment to exit and enter the building and often passed him sitting on the porch.  The mother stated she continued to live in the building because she did not feel safe in a shelter.  The mother refused to move to New York to live with her mother.

The family action plan developed by the department for the mother included the following tasks:  obtain safe and stable housing; meet with her social worker monthly; maintain healthy relationships; participate in domestic violence services and counselling, individual therapy, and parenting classes; sign releases; attend supervised visits with Cameron; have no phone contact with the father during visitation; create a reunification and child care plan; and express in writing why Cameron was removed from her care and how her actions contributed to his removal.

On December 9, 2019, the department changed the case goal from reunification to adoption.  Multiple foster care review panels found that the mother failed to enroll in individual therapy and to provide the department with a reunification plan and that she continued to struggle to acknowledge why Cameron had been removed from her care.

In June or July 2020, the mother began a romantic relationship with a new man (boyfriend).  In the fall of 2020, the boyfriend moved in with the mother.  The boyfriend did not

5

contribute financially to the household and moved from job to job.  Within two months of cohabitating, the mother and boyfriend were engaged to be married.  The mother included the boyfriend as a potential coparent for Cameron on at least one of the reunification plans she submitted and asked the department to assess him.  The boyfriend never attended the mother's visitation with Cameron.  In May 2021, the mother ended her relationship with the boyfriend after she found evidence that he had been unfaithful.

Discussion.  "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilian, 91 Mass. App. Ct. 727, 729 (2017), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).  "We give substantial deference to the judge's decision to terminate parental rights 'and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Talik, 92 Mass. App. Ct. 367, 370 (2017), quoting Adoption of Ilona, supra.

1.  Fitness.  A parent's ability to adequately protect a child from harm is relevant to determining parental fitness. See Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021) (judge

6

may consider parent's decision to remain in relationship with abusive partner when determining fitness); Adoption of Anton, 72 Mass. App. Ct. 667, 673-675 (2008) (parent's failure to protect child from sex offender relevant in determining fitness).

The mother argues that the department did not meet its burden to prove parental unfitness by clear and convincing evidence. We disagree. The judge considered the required factors set forth in G. L. c. 210, § 3 (c), and found factors (ii), (v), (vi), (vii), (viii), (ix), and (xii) applicable to her determination that the mother was unfit. The mother's unfitness resulted not simply from the July 4 incident but from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000).

First, the evidence at trial showed that the mother was unwilling to accept that Nora had been sexually assaulted, and she thereafter remained unable or unwilling to accept the father's likely role in the assault, despite substantial evidence to the contrary and the absence of a plausible alternative explanation.[4]

---

[4] The mother disputes the judge's characterization of her testimony at trial, arguing that the judge conflated the mother's testimony responding to questions about her prior beliefs about the father's guilt with her beliefs at the time of trial. To the contrary, the judge did not credit the mother's testimony that she came to believe six months before the trial that the father assaulted Nora. That credibility determination was, of course, squarely within the province of the trial judge

For at least three months after the assault, the mother continued to suggest that Nora's injuries were caused by either self-scratching or a "straddle injury" from falling onto her bed railing. At trial, the mother acknowledged that neither of those explanations was reasonable considering Nora's injuries. At least six months after the assault, the mother stated that she could not be sure of the father's guilt unless she saw DNA evidence.

Despite observing the severity of Nora's injuries, the mother chose to leave Cameron and Kevin alone in the father's care while she took Nora to the hospital, and she accepted his claims that he did not know what happened to Nora.

The record supports the judge's finding that the mother failed to properly investigate how such an injury to a child could occur in her home. The mother did not go into Nora's room after returning from the hospital, did not attempt to find the pull-up diaper or any of the clothes Nora had been wearing the day of the assault, nor did she ask the father where the clothes went.

---

as finder of fact. See Commonwealth v. Bohannon, 376 Mass. 90, 94 (1978). Inasmuch as the mother's challenge to the judge's findings rests on the mother's discredited testimony, it is unavailing.

8

Moreover, the mother did not end her relationship with the father for nearly three weeks after the July 4 incident, visited him in jail on two occasions, and attended two or three of his court hearings. The mother lived in the same building where the father lived for nine months after he was released on bail.

A trial judge has "discretion to evaluate a witness's credibility and to weigh the evidence." Adoption of Nancy, 443 Mass. 512, 515 (2005). The judge did not credit the mother's testimony that she now believed the father sexually assaulted Nora. Likewise, the judge was entitled to disbelieve the department social worker's opinion that the mother's attitude toward the father appeared to have changed in January 2021.

The mother's inability to accept that the father likely assaulted Nora created a risk that she would not protect Cameron from the father or other household members posing similar risk of abuse.[5]

Taken as a whole, the record evidence amply supports the judge's findings and determination that the mother is unfit to care for Cameron.[6]

---

[5] The department's concern extended to the mother's ongoing inability to make prudent judgments about the romantic partners she brought into Cameron's life. The mother's subsequent relationship with the boyfriend showed that her poor judgment was not confined to her relationship with the father.

[6] We note that "[d]espite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . [does] not love the child"

2. Termination of parental rights. "After ascertaining unfitness, the judge must determine whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, 443 Mass. at 515. "[A] judge considering termination also must consider the child's unqualified right to permanency and stability and cannot hinge predictions of future fitness determinations on a 'faint hope' that the parent will become fit at some indeterminate time." Care & Protection of Zeb, 489 Mass. 783, 789 (2022), quoting Adoption of Ilona, 459 Mass. at 59-60.

Considering the mother's continuing tendency to enter significant relationships without appreciating the potential risk to Cameron, the judge acted within her discretion in terminating the mother's parental rights. There was no indication in the record that the mother's inability to identify the risk to her child posed by her choice of inappropriate romantic partners was temporary or would subside in the foreseeable future. Compare Adoption of Carlos, 413 Mass. 339, 350-351 (1992) (declining to terminate parental rights where judge found mother's parental unfitness could be resolved with additional time).

_____

(citation omitted). Adoption of Bea, 97 Mass. App. Ct. 416, 417 n.2 (2020).

10

3. <u>Posttermination and postadoption visitation</u>.  The Supreme Judicial Court has "repeatedly recognized the equitable authority of a judge to order visitation between a child and a parent whose parental rights have been terminated, where such visitation is in the child's best interest."  <u>Adoption of Ilona</u>, 459 Mass. at 63.  Review of a judge's order concerning posttermination and postadoption visitation is for "abuse of discretion or clear error of law."  <u>Adoption of Zander</u>, 83 Mass. App. Ct. 363, 364 (2013).

Cameron argues that the judge abused his discretion in ordering posttermination and postadoption visitation.  We agree.

"[T]he first question . . . a judge should consider . . . [is] whether there is a 'significant bond existing with the biological parent."  <u>Adoption of Ilona</u>, 459 Mass. at 63-64, quoting <u>Adoption of Vito</u>, 431 Mass. 550, 563 (2009).

Cameron was only eight weeks old at the time he was placed with the preadoptive mother.  We do not discount the mother's consistent history of positive visitation with Cameron. However, such visits are insufficient to create a significant bond that overcomes Cameron's interest in stability with his adoptive family.  See <u>Adoption of Greta</u>, 431 Mass. at 578, 580-581 (finding insufficient evidence of significant bond between mother and child despite four years of regular visitation).

11

We accordingly conclude that the judge abused her discretion in ordering posttermination and postadoption visitation with the mother.  See Adoption of John, 53 Mass. App. Ct. at 439 (2001).

For the foregoing reasons, that portion of the decree terminating the mother's parental rights to Cameron is affirmed. The order providing the mother with posttermination and postadoption visitation is vacated.  We remand the case to the Juvenile Court and direct that the order be modified consistent with this memorandum and order.[7]

So ordered.

By the Court (Green, C.J., Blake & Henry, JJ.[8]),

Assistant Clerk

Entered:  March 4, 2024.

---

[8] The panelists are listed in order of seniority.