NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-670

ADOPTION OF DAYTEN.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered by a Juvenile Court judge after trial, finding the mother unfit to parent Dayten (the child) and terminating her parental rights.  The decree also leaves post-termination visitation between the mother and the child to the discretion of the child's pre-adoptive parents, but does not order that visitation must occur.  The mother contests the finding of unfitness, arguing that there is an insufficient nexus between her conduct and the alleged medical neglect of the child.  The mother also contends that the judge abused her discretion in declining to order post-termination visitation.  We are not persuaded and accordingly, affirm.

Background.  The child was born on June 14, 2015.  On March 4, 2019, the Department of Children and Families (the

---

[1] A pseudonym.

department) filed a petition alleging that the child was in need of care and protection due to the mother's medical neglect, and the child was placed in the department's custody. The child was placed with his pre-adoptive family in August 2020, where he has remained since that time. In February 2021, the mother stipulated to current unfitness, and to the department's assumption of permanent custody of the child. Trial occurred in May 2022, and the decree entered at its conclusion.[2]

a. The child's asthma. The child suffers from severe persistent asthma. While he was in the mother's custody, the child was seen by his pediatrician, Dr. Blasburg, on nine occasions due to this condition. He was admitted to the hospital four times -- in February, March, and June of 2018, and in February 2019. While in the mother's care and although the mother was aware of the child's asthma diagnosis, she failed to bring the child to numerous scheduled medical appointments with his pediatrician, specialists, and other providers. The child was referred to Dr. May, a pulmonologist, in August 2018, but the mother did not present the child for his initial appointment. She also failed to bring the child to a scheduled appointment in January 2019 with Dr. Goshharja, a specialist in

---

[2] The child's father filed a stipulation with the court agreeing to a finding of parental unfitness, and the father's parental rights were terminated in July 2020.

allergy and asthma.  The child was referred to the Boston Children's Hospital Medical Home Asthma Program, but after the child's initial appointment the mother declined all follow-ups. In February 2019, the child was treated at Plymouth Pediatric Associates for symptoms of respiratory distress.  When the mother failed to bring the child to his follow-up appointment six days later, on February 25, 2019, a mandatory reporter at that facility filed a 51A report alleging medical neglect.  The department removed the child on March 1.

b.  The mother's smoking.  The mother has a history of cigarette smoking, which persisted long after the child was diagnosed with asthma.  The child has a significant sensitivity to smoke.  Although the mother testified at trial that she never smoked in the home while the child resided there, the judge found that she regularly returned indoors after smoking with items that smelled of smoke, which the judge concluded evidenced the mother's failure to appreciate the effects of thirdhand smoke.  After the child was removed, the mother brought items that smelled of smoke to visits.

The mother's smoking habit persisted while the child was still in her care and receiving treatment for asthma, and after the child was removed.  For example, the 51A report filed by the mandatory reporter at Plymouth Pediatric alleged that during the child's nebulizer treatment on February 19, 2019, the mother

3

excused herself to smoke a cigarette outside.  The mother was still smoking at the time of the March 2, 2020 foster care reviews.

c.  <u>Dental issues</u>.  Subsequent to the child's removal in March 2019, he was found to be suffering from severe dental decay, with nerve exposure on several teeth and the near total disintegration of another tooth.  The judge found that the mother had failed to take the child to routine dental appointments.  The mother claimed at trial that the child had received dental care at Dental Center Pediatrics (Dental Center) in November 2018.  The court did not credit this testimony in light of other evidence that the child had not been seen by providers at Dental Center since July 2018.  After removal and shortly before the child's fourth birthday, in May 2019, the child underwent dental surgery, during which he received, among other things, four root canals and five extractions.  The mother admitted at trial that, while the child was in her care, she had failed to brush the child's teeth after nebulizer treatments for his asthma.

d.  <u>The mother's substance abuse</u>.  The mother has a long history of substance abuse, including alcohol abuse and the use of nonprescribed drugs.  She has been addicted to opiates, which she used intravenously during her pregnancy with the child.  She did not obtain routine prenatal care during her pregnancy.  As a

4

result of her substance use, the child was born exposed to marijuana. The mother has also abused benzodiazepines. In June 2019, the mother admitted both to using substances and to altering her toxicology screens. In July 2021, the department learned that the mother signed a restricted release preventing the department from obtaining her toxicology results from a substance abuse treatment program. The mother admitted to relapsing and using benzodiazepines in October and November of 2021 -- five months before trial. She did not seek detoxification or inpatient treatment following these relapses.

e. <u>Visitation history</u>. Following the child's removal, the mother was initially permitted weekly visitation which she consistently attended through June 2019. After that point, the mother's attendance grew less consistent through late 2019 and January 2020. On one occasion in February 2020, a social worker assigned to the case raised concerns about the mother's appearance, noting that the mother was pale and smelled strongly of cigarette smoke. After the onset of the COVID-19 pandemic, the mother was provided thirty-minute video visits. While visiting with the child in June 2020, the mother presented with delayed speech, and she was drooling and asking repetitive questions. The mother claimed that her demeanor was due to a dental issue of her own but failed to verify this statement, and the judge did not credit her testimony.

The judge found that the reduction in visits between the mother and the child during the COVID-19 pandemic corresponded with improvements in the child's demeanor in the foster home. Conversely, following visits with the mother and for several days thereafter, the child exhibited signs of behavioral regression -- increased tantrums and issues with toilet training and wetting the bed. During virtual visits with the mother, the child frequently hid under the desk or attempted to leave the room. The mother testified that after the child was placed in his pre-adoptive home, he grew increasingly disengaged during visits, often refusing to speak with the mother or presenting as angry. The parties attempted to recommence in-person visits with the mother in April 2021, but the child became emotional and violently refused to attend. The mother's visitation was reduced to monthly in September 2021, and her attendance remained inconsistent.

The judge held a three-day trial concerning the termination of mother's parental rights in May 2022. The mother opposed the termination and sought custody of the child or, in the alternative, proposed that the child be placed with his maternal grandmother. The judge declined to credit numerous statements made by the mother during her testimony. On May 26, 2022, the judge concluded that the mother was unfit, terminated her

6

parental rights, and committed the child to the permanent custody of the department.

With respect to visitation, as of the time of trial the mother's visits remained virtual.  By that point, the child had been residing with his pre-adoptive family for almost two years.  The child had refused in person visits with the mother since March 2020.  At the close of trial, the judge left post-termination visitation between the mother and the child to the discretion of the department and, as to post-adoptive visitation, to the discretion of the adoptive family.  This appeal followed.

Discussion.  The mother's principal argument on appeal is that the department failed to meet its burden to establish a "clear nexus" between her conduct -- in particular, her supervision of the child's medical and dental health, her smoking, and her substance use -- and harm to the child.   She also contends that it was improper for the department to use her failure to bring the child to certain medical providers as evidence of medical neglect, when the department itself discontinued use of those providers post-removal.  We disagree.

We review a decision to terminate parental rights for abuse of discretion or clear error of law.  Adoption of Elena, 446 Mass. 24, 30 (2006).  We afford deference to the trial "judge's assessment of the weight of the evidence and the credibility of

7

the witnesses" (citation omitted).  Adoption of Quentin, 424 Mass. 882, 886 (1997).  To terminate parental rights, the trial "judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).

While parents have the fundamental right to parent their children, that right must give way should the safety and welfare of the child require state intervention.  Petition of the New Home for Little Wanderers to Dispense with Consent to Adoption, 383 Mass. 573, 587-589 (1981); Adoption of Greta, 431 Mass. 577, 587 (2007).  In finding parental unfitness, the trial judge must consider "a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Quentin, 424 Mass. at 886, quoting Adoption of Mary, 414 Mass. 705, 711 (1993).  The judge may "rely upon prior patterns of ongoing, repeated, serious parental neglect."  Adoption of Kimberly, 414 Mass. 526, 529 (1993), quoting Adoption of Diane, 400 Mass. 196, 204 (1987).

1.  The nexus between the judge's findings and medical neglect.  At bottom, the mother's argument is that there is an insufficient nexus between the judge's findings and the

8

conclusion that the mother was and would remain unfit to care for the child.  The mother asserts that she was meeting the child's "basic needs," and that the concerns with medical neglect were overstated.

As noted above, it is not our role to substitute our own weighing of the evidence for that of the trial judge, but in any event here the evidence of past neglect was consistent, substantial, and continuing.  This court has explained that "[t]he specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness." Petitions of the Dep't of Soc. Services to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 125 (1984), citing Petitions of the Dep't of Soc. Services to Dispense with Consent to Adoption, 389 Mass. 793, 799-800 (1983); Petition of the Dep't of Soc. Services to Dispense with Consent to Adoption, 16 Mass. App. Ct. 965, 966 (1983).  Here, the evidence of prior medical neglect included a marked failure to attend properly to the child's severe asthma issues.  The child was repeatedly hospitalized in the year before removal, yet the mother was inconsistent in bringing the child to appointments with medical providers regarding the issue.  The child was hospitalized again in February 2019, yet the mother missed another medical appointment with the child's doctor within a matter of days of

9

discharge, shortly before the child was removed. The child's doctor confirmed that the asthma issues were acute, yet the mother minimized the child's condition, including in her trial testimony.

a. The mother's smoking. The mother continued to smoke and to bring smoke into the child's presence, despite knowing that smoke was a trigger of the child's asthma. The mother's smoking continued after the child was removed, and the mother remains living in a residence where smokers are present. Others have also observed the mother smoking while the child was present, including outside a medical facility where the child was being seen for his asthma. The mother's failure to acknowledge the potential harmful effects of cigarette smoke on the child and the evidence of her continued proximity to cigarette smoke support the conclusion that she is unfit to parent this asthmatic child.

b. Dental neglect. After removal, it became apparent that the medical neglect extended to dental neglect as well. "Where a parent is ineffective in obtaining medical care for a child, causing neglect of the child, it is relevant to finding of unfitness." Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008), citing Adoption of Ramon, 41 Mass. App. Ct. 709, 711 (1996). The mother failed to take the child to routine dental appointments, admitted that she was supposed to brush the

10

child's teeth after asthma treatments but did not do so, and gave the child high-sugar beverages several times per day. The child's resulting significant dental decay led to an involved oral surgery. While the mother disputes that she knew of the dangers of dental decay and gum disease related to nebulizer treatments, that argument is beside the point. The child's dental problems were extensive (including one tooth that had disintegrated), and it was reasonable to infer that these problems could not have gone unnoticed absent neglect by the mother.

c. Substance abuse. The mother's substance abuse was ongoing, and it was reasonable to infer that the substance abuse had affected the mother's care and might affect it again in the future. A history of substance abuse is "relevant to a parent's willingness, competence, and availability to provide care," Adoption of Anton, 72 Mass. App. Ct. at 676, provided there is a sufficient nexus between the substance use and unfitness. See Care & Protection of Bruce, 44 Mass. App. Ct. 758, 763 (1998). Here the evidence of substance abuse was not only in the past, but continued up to the time of trial.

The mother has consistently failed to be honest with the department regarding results of her toxicology screens, even admitting to altering the results of tests in 2019. The department raised concerns about whether the mother was under

11

the influence of substances during a virtual visit with the child in June 2020.  The mother relapsed in her use of benzodiazepines as late as November 2021, and despite being aware of the dangers of withdrawal, did not seek inpatient treatment.  There was no error in the judge considering such recent issues with ongoing substance use as evidence that the mother's unfitness would continue into the future.

d.  <u>Discontinuation of relationships with medical providers</u>.  Finally, the mother suggests that the finding of unfitness was inappropriate because the department discontinued relationships with certain medical providers despite previously faulting the mother for failing to utilize the same services. The fact that the department adjusted the child's medical treatment plan post-removal does not bear on the mother's neglect of the child while the child was in her care.  The mother failed to attend scheduled appointment with current providers and made no alternative arrangements for the child to be seen by other service providers.  Conversely, as the child's medical condition was better understood during the months after removal, it was appropriate for the department to make changes to the list of the child's service providers.  For instance, the child was no longer in need of follow-up care from an allergist when it was determined that the child did not have any allergies.

Given the judge's findings regarding the mother's failure to properly address (and instead to minimize) the child's special medical needs as well as the mother's smoking, her neglect of the child's dental needs, and the potential dangers of her ongoing substance abuse, we are satisfied that there exists a sufficient nexus to support the judge's finding of unfitness.

2. Post-termination visitation. Finally, the mother argues that it was improper for the judge to fail to require post-termination visitation. We review a decision declining to order post-termination or post-adoption visitation for abuse of discretion. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 623-624 (2021), citing Adoption of Ilona, 459 Mass. 53, 66 (2011). In determining the appropriateness of post-termination visitation, "a judge should consider, among other factors, whether there is a 'significant, existing bond with the biological parent' whose rights have been terminated[,]. . . whether a preadoptive family has been identified[,] and, if so, whether the child 'has formed strong, nurturing bonds' with that family." Adoption of Iliona, supra at 63-64, quoting Adoption of Vito, 431 Mass. at 563. Protecting the best interests of the child is the overriding concern. Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003), quoting Adoption of Vito, supra at 562 ("The judge's discretion is not . . . unfettered, but must be

13

'grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation'").

Here, the judge acted within her discretion in declining to order post-termination and post-adoption visitation between the child and the mother. As discussed above, the evidence did not show a strong existing bond between the child and the mother at the time of trial. The mother's visitations began being inconsistent in late 2019, and during the pandemic the virtual visits were relatively brief, and the child evidenced signs of significant behavioral regression and emotional distress. Even during virtual visits with the mother, the child frequently appeared disengaged, attempted to leave the room, or hid from view. At the time of trial, the child was emotionally bonded to his pre-adoptive family. Under these facts, it cannot be said that the judge abused her discretion in failing to order post-termination visitation and in leaving post-adoption visitation

14

to the discretion of the child's adoptive parents.  See Adoption
of Vito, 431 Mass. at 563.

                                        Decree affirmed.

                                        By the Court (Green, C.J.,
                                          Neyman & Englander, JJ.[3]),

                                        Assistant Clerk

Entered:  March 26, 2024.

---

[3] The panelists are listed in order of seniority.