# ADOPTION OF ANTON.[1]

No. 08-P-347.

Bristol. June 16, 2008. - September 17, 2008.

Present: KAFKER, VUONO, & GRAINGER, JJ.

*Adoption,* Care and protection, Dispensing with parent's consent. *Parent and Child,* Care and protection of minor, Adoption, Dispensing with parent's consent to adoption, Interference with parental rights. *Minor,* Care and protection, Adoption.

At a care and protection proceeding, sufficient evidence existed to support the judge's subsidiary findings, which, when taken together, provided clear and convincing evidence of the mother's current unfitness to provide for the welfare and best interests of the child, where, in considering the mother's ongoing relationship with a level three sex offender, the judge appropriately took into consideration that the sex offender presented a high risk of sexual abuse of the child and that the mother, after having been fully informed of the extensive evidence of the sex offender's prior abuse, failed to accept that any of the admitted, repeated acts of abuse had occurred or to adopt a protective attitude toward the child [673-675]; and where the judge appropriately considered evidence of the mother's failure to obtain necessary dental care for the child, her inability to secure adequate stable housing, and her drug use, as well as the child's therapist's recommendation of a reduction in the child's visits with the mother [675-676].

There was no merit to a mother's untimely claim that the Department of Children and Families failed to provide adequate services prior to proceeding to terminate the mother's parental rights. [676-677]

PETITION filed in the Bristol County Division of the Juvenile Court Department on August 19, 2005.

The case was heard by *Bettina Borders*, J.

*Lisa J. Campbell* for the mother.

*Daniel A. Less*, Assistant Attorney General, for Department of Children and Families.

*Karen O. Young* for the child.

KAFKER, J. At issue is the fitness of a mother married to a

---

[1] A pseudonym.

level three sex offender who had repeatedly raped his stepdaughter from an earlier marriage. The mother was unwilling or unable to acknowledge her husband's prior abuse or the risk that he posed to her son, Anton. The mother also used drugs provided by her husband while she was pregnant with another child and had trouble securing adequate housing due in part to her refusal to separate from her husband. Finally, the mother neglected Anton's dental care, causing serious decay of his baby teeth. The mother appeals, claiming that there was not clear and convincing evidence of her unfitness to parent Anton. We affirm the decision of the Juvenile Court judge terminating the mother's parental rights.

*Facts.* The following facts, found by the trial judge, are relevant to the present appeal. In February of 2002, at twenty-seven years of age, the mother gave birth to Anton, who was five years of age at the time of trial. Anton's biological father left after Anton's birth and is not part of these proceedings. For the first three to four months of Anton's life, the mother lived with her own mother (grandmother) in Rockland before moving in with her then boyfriend, now husband, Ben Marks,[2] in New Bedford.

Marks has an extensive criminal history. Most significantly, in 1988, Marks was convicted of sexually abusing his five year old stepdaughter on five separate occasions, for which he received a five- to seven-year suspended sentence and was put on probation. In 1993, Marks reoffended with the same child, despite having completed therapy, a sex offender evaluation, a psychological evaluation, and other reunification services offered by the Department of Children and Families (DCF). From 1993 to 1999, Marks served his previously suspended sentence. During his incarceration, he completed the intensive treatment program, phase IV, and developed a comprehensive relapse prevention plan. That plan prohibited him from being in a relationship with a woman who had a child between three and five years of age. The plan also called for Marks to attend sex offender therapy regularly and support group sessions as needed, neither of which he was doing at the time of trial.[3] The plan also required that he abide by all laws, including those governing registration as a sex offender.

---

[2] A pseudonym.

[3] The mother contests the finding that Marks had not been attending sex of-

G. L. c. 6, § 178H(*a*)(1). Marks was classified as a level three sex offender at the time of trial. Marks had been previously diagnosed as having a psychosexual disorder, i.e., pedophilia, a substance abuse problem, and a borderline personality disorder.

The mother had learned of Marks's sex offender status in 2003. She believed, however, that the charges were "a result of his former wife who was out to get him during their divorce." Despite his admission to the crime of child rape, the mother believed that "there was not enough evidence against [Marks]" and that this lack of evidence is the reason he "received a suspended sentence." She also believed that he had "no choice but to plead guilty because of his lawyer at the time." The judge found her "unrealistic in her interpretation of the events regarding [Marks's] sexual offenses."

The mother, Marks, and Anton lived together in New Bedford until approximately April, 2004, when the mother and Anton moved to Michigan. The following month, Marks joined the mother and Anton, and all three lived together in Michigan. On December 14, 2004, Marks was arrested for failing to register as a sex offender in Michigan. See G. L. c. 6, § 178E(*b*), as amended by St. 2003, c. 140, §§ 6 & 7; G. L. c. 6, § 178H(1). At the time of Marks's arrest, Anton was alone with him in the home.[4] Marks was incarcerated briefly in a Michigan jail where the mother would visit him twice a week, occasionally bringing Anton. Marks was then extradited to Massachusetts in February of 2005, where the mother followed him, leaving Anton with her sister in Michigan. Marks remained in jail until June of 2005.

---

fender therapy at the time of trial. There was ample evidence that Marks refused to continue sex offender therapy, but there was testimony that two weeks prior to trial, he began some sort of therapy "because of stress and lack of sleep." This does not appear to have been sex offender therapy. Moreover, this is not the type of sustained, ongoing sex offender therapy required by his relapse prevention plan to address his pedophilia.

[4]On January 28, 2005, Michigan Protective Services (the Michigan equivalent of DCF) filed an investigation for suspected sexual abuse of Anton by Marks. However, the doctor found Anton's physical exam to be within normal limits, noting only that Anton was too young to verbalize sexual abuse, even if it had occurred. The mother had previously had Anton evaluated for sexual abuse in 2003 when the mother and child were living with Marks and a young adult. The mother had become concerned because Anton was touching himself and others inappropriately. Sexual abuse was not established.

On July 15, 2005, the mother married Marks before returning to Michigan shortly thereafter to bring Anton back to Massachusetts. The three lived together until August 19, 2005, when DCF took temporary custody of Anton. Custody was granted to DCF because of concerns about Anton's safety while living with a level three sex offender.

On September 13, 2005, approximately one month after Anton was removed from the mother's care, DCF filed a G. L. c. 119, § 51A, report alleging dental neglect because many of Anton's twenty baby teeth were seriously decayed, of which two were so badly decayed that they had broken off at the root. The decay was painful for Anton and made it difficult for him to eat.

Since returning to Massachusetts in August, 2005, the mother has lived in at least two different apartments and at least three different shelters. After Anton was taken into DCF's custody, the mother moved into the Sisters of Charity shelter. The mother testified that she moved to this shelter because DCF did not want her to live with Marks. The mother then moved into an apartment in New Bedford, where she lived alone, although Marks lived close by and had keys to the apartment. In August of 2006, the mother moved into another apartment in New Bedford. Then, in October, 2006, the mother was in a women's shelter for approximately one month before returning to an apartment where Marks lived with her for at least two weeks before they were both evicted. Upon eviction in November of 2006, the mother entered the Harbor House Family Shelter, but was asked to leave because she continued to see Marks.[5] At the time of trial, the mother was back in the Sisters of Charity homeless shelter awaiting admission to the Donovan House shelter.

Beginning with Anton's removal, DCF prepared a total of four service plans, the first two of which had the goal of reunification, and the final two had the goal of adoption. Marks did not sign any of the plans. The mother signed the first three service plans, but wrote on the third that she did not "agree

_____

[5]Because of Marks's sex offender status, the mother was forbidden to see Marks while staying in the Harbor House Family Shelter to protect the other shelter residents from a known abuser.

with 90% of the accusations and proof of it all." The mother's tasks on her service plans included (1) individual counselling to discuss the risk to Anton from her involvement with Marks; (2) documented progress that she understands the risk; (3) a psychological evaluation; and (4) appropriate discussions with Anton during visits. The final plan included random drug screening, a substance abuse evaluation, and obtaining appropriate housing.[6] On January 20, 2006, DCF changed the goal for Anton to adoption.[7] Subsequently, on February 15, 2006, the mother's psychological evaluation showed that she had made no progress in understanding the risks posed to Anton by living with a level three sex offender. Based on that evaluation and the mother's continuing to make inappropriate comments to Anton during visits, foster care reviews dated February 22, 2006, and September 7, 2006, concluded that the mother had "insufficiently completed her service plan tasks."[8] Additional evidence of her noncompliance was her inability to secure permanent housing for herself and Anton.

On November 17, 2006, the mother gave birth to Marks's child, Evan,[9] Anton's half-brother. Ten days later, on November 27, 2006, DCF filed a G. L. c. 119, § 51A, allegation of neglect of Evan, which was supported under G. L. c. 119, § 51B, due to the mother's ingestion of cocaine and marijuana in March, 2006, while pregnant with Evan. While there is no evidence of sustained or continued drug use by the mother, Marks has a long history of drug use and supplied the mother with the cocaine and marijuana she admitted to using.

On December 15, 2005, and February 27, 2006, Anton was evaluated for developmental and behavioral problems at the Center for Children and Families. He was found to have signi-

---

[6]Drug screening and a substance abuse evaluation were included after the mother admitted to using marijuana and cocaine while pregnant.

[7]There is dispute whether DCF changed the goal for Anton to adoption on January 20, 2006, or December 20, 2005. However, the possible discrepancy of a month is not material to the issues here.

[8]The mother had previously told Anton that policemen are bad and that firemen will light him on fire. When Anton then saw policemen or firemen, he became frightened. During visits, she made inappropriate comments, including comments regarding the foster mother.

[9]A pseudonym. This child is not involved in this appeal.

ficant developmental delays in speech, expressive and receptive language, and cognitive and fine motor skills. He was also described as aggressive and hyperactive, as swearing frequently, and as suffering from encopresis and enuresis. He also spread his feces with his hands around the house. After December 21, 2006, Anton did not show affection toward the mother and regressed after visits with her. Following Anton's therapist's suggestion, DCF reduced the mother's visits from weekly to biweekly.

Although the mother had indicated that she and Marks have separated since DCF's involvement with her family, the trial judge found the mother to be dishonest about her relationship. The mother's social worker had observed, on unannounced visits, Marks in and around the mother's home and with keys to the home. Additionally, the social worker had seen the mother and Marks in public together.[10] Moreover, the mother frequently talked on the telephone with Marks when they were living in separate shelters and continued to regard Marks as her sole source of support besides her counsellor.

*Procedural history.* On August 19, 2005, DCF was granted temporary custody of Anton because of the mother's alleged neglect pursuant to G. L. c. 119, § 24. On February 21, 2006, DCF filed its notice of intent to proceed under G. L. c. 119, § 26, and G. L. c. 210, § 3. Trial was held on January 19 and 26, 2007, and February 23, 2007. On April 26, 2007, the trial judge found Anton in need of care and protection and dispensed with parental consent to adoption.[11] The mother filed a timely appeal.

*Standard of review.* In care and protection cases, the trial judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous. See *Care & Protection of Laura*, 414 Mass. 788, 793 (1993);

---

[10]For example, on December 14, 2006, the mother was seen walking with Marks, holding hands. This was seven days after the mother had been shown Marks's psychological evaluation, police reports with details of his sexual offenses, and his admissions about abusing his brother and sister as a child. After being shown the documents, the mother had said she was going to leave him.

[11]The judge found that the current adoption plan included "exploring a placement with [Anton's] maternal aunt in Michigan who has come forward."

*Custody of Eleanor*, 414 Mass. 795, 799 (1993). Taken together, these findings must then prove clearly and convincingly that the parent is currently unfit to provide for the welfare and best interests of the child. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). The judge is free to rely on a parent's "prior patterns of neglect and misconduct in determining her current unfitness." *Adoption of Mario*, 43 Mass. App. Ct. 767, 773 (1997). Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age. *Adoption of Mary*, 414 Mass. 705, 711 (1993). The mother challenges the sufficiency of the evidence supporting the judge's conclusion that she was unfit, disputing individual facts and arguing that the subsidiary facts do not establish her unfitness by clear and convincing evidence. We disagree.

*Discussion.* The judge's findings[12] are both "specific and detailed," demonstrating, as we require, that close attention was given to the evidence. *Adoption of Helen*, 429 Mass. 856, 859 (1999). Those findings, which reflect endangerment and neglect of Anton, provide clear and convincing evidence of the mother's unfitness.

1. *Failure to protect Anton from risk of sexual abuse.* First and foremost, the mother's ongoing relationship with Marks presents a high risk of sexual abuse of Anton that was an "appropriate and relevant" consideration in the judge's determination of the mother's fitness. *Care & Protection of Isabelle*, 33 Mass. App. Ct. 548, 549 (1992). Marks was convicted of sexually abusing his stepdaughter from another marriage in 1987 and again in 1993, even after completing therapy, a sex offender evaluation, and other reunification services provided by DCF. He has been diagnosed with pedophilia. See, e.g., *Doe, Sex Offender Registry Bd. No. 1211* v. *Sex Offender Registry Bd.*, 447 Mass. 750, 765-766 (2006) (discussing special risks posed by pedophiles). As a level three sex offender, he has been deter-

---

[12]The mother claims that thirteen findings of fact were clearly erroneous. Most of these objections arise out of disagreements concerning credibility findings. See *Custody of Two Minors*, 396 Mass. 610, 618 (1986); *Adoption of Larry*, 434 Mass. 456, 467 (2001) (trial judge in best position to assess credibility). Our review of the record shows that the challenged findings were adequately supported, immaterial, or both.

mined by law to present a high risk of reoffense and dangerousness. G. L. c. 6, § 178K(1). His relapse prevention plan required that he stay away from women with children between three and five years of age; Marks had not complied with this condition because of his relationship with the mother.[13] See G. L. c. 6, § 178K(2)(c). Further, he was not engaged in sex offender therapy at the time of trial, nor had he attended support group sessions as mandated by his relapse prevention plan. See *Commonwealth* v. *Chapman*, 444 Mass. 15, 24 (2005) (failure of pedophile to continue sex offender treatment "particularly relevant" to his risk of reoffending). In sum, given Marks's prior rapes of his stepdaughter, his pedophilia, his level three sex offender status, and his noncompliance with his relapse prevention plan, the judge correctly considered Marks a significant danger to Anton. Neither the judge or DCF had to wait for Anton to be sexually abused before requiring an appropriate response from the mother. See *Custody of Two Minors*, 396 Mass. 610, 620 (1986) (threatened physical abuse sufficient); *Adoption of Katharine*, 42 Mass. App. Ct. 25, 32 (1997) ("neither agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need to wait for inevitable disaster to happen").

In determining the fitness of a mother involved in a relationship with a high-risk sex offender, the judge properly considered whether the mother had been informed of and acknowledged his prior abuse, demonstrated an understanding of the risk that the sex offender posed to her child, and taken appropriate actions in response to that risk. See generally *Adoption of Carlos*, 413 Mass. 339, 351 (1992) (emphasizing that mother had made " 'significant progress' with respect to her critical area of potential unfitness, namely her denial that her child had been sexually abused"); *Adoption of Kimberly*, 414 Mass. 526, 530 (1993) (mother unfit who "was very slow to acknowledge and deal with the impact of" sexual abuse of her children and continued to live with abuser of her children); *Care & Protection of*

---

[13]The mother's argument that Marks's victims are only female children and thus he posed no risk to Anton is unpersuasive: as a child, Marks abused his brother and was abused himself by his father and his uncle. Further, there is nothing in the relapse prevention plan limiting the restriction to girls.

*Isabelle, supra* at 552 (mother not unfit where she terminated her relationship and cut ties with her child's father, who had sexually abused his son from prior relationship).

In the instant case, the mother was fully informed of the extensive evidence of prior abuse, including Marks's admissions and convictions. The mother nonetheless failed to accept that any of the admitted, repeated acts of sexual abuse had occurred. See *Adoption of Kimberly, supra*; *Adoption of Larry,* 434 Mass. 456, 472 (2001) ("persistent refusal or inability to recognize and address the father's intentional, violent conduct" evidence of unfitness). See also *Adoption of Carlos, supra.* The mother denied that Marks presented a risk to her child despite expert views to the contrary and counselling to that effect. Finally, she continued the relationship despite Marks's refusal even to attend therapy or comply with other requirements of his own relapse prevention plan. See *Adoption of Larry, supra* (mother found unfit where father made no strides toward addressing abusive behavior and mother excused father's refusal to attend joint counselling). Contrast *Care & Protection of Isabelle, supra* (mother agreed not to reunite with father or allow him access to child and removed child immediately when she saw father together with child). The mother had not separated herself from Marks, but rather attempted to conceal her relationship from DCF. Empty gestures at separation will not suffice. See *Adoption of Mary,* 414 Mass. at 711 (finding no separation had occurred where mother continued to visit spouse in jail); *Adoption of Larry, supra* at 471 (disbelieving authenticity of divorce proceedings where mother indicated emotional dependence on her spouse).

The mother maintained her essentially unconditional allegiance to Marks despite being informed that such an allegiance jeopardized the safety of Anton and her parental rights. Her willingness to ignore "overwhelming evidence" of Marks's past abuse and to adopt a protective attitude toward Marks and not the child provided clear and convincing evidence that she cannot protect Anton from Marks. See *Adoption of Larry, supra* at 472.

2. *Other evidence of unfitness.* There is other significant evidence of the mother's over-all unfitness to care for Anton.

Where a parent is ineffective in obtaining medical care for a child, causing neglect of the child, it is relevant to finding of unfitness. See *Adoption of Ramon*, 41 Mass. App. Ct. 709, 711 (1996). The mother's failure to obtain the dental care necessary to keep Anton's teeth healthy was correctly considered in the determination of her ability to continue to care for Anton.

The mother's inability to secure "adequate stable housing" was also properly considered in determining her unfitness. See *Adoption of Vito*, 431 Mass. 550, 555 (2000) (inadequate housing properly considered along with other evidence of unfitness); *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense With Consent to Adoption*, 395 Mass. 180, 184 (1985) (judge properly concluded that parent's unstable housing — moving six times in less than two years — had deleterious effect on child). From August, 2005, to the date of trial in 2007, the mother had moved at least seven times and had lived in at least three different homeless shelters. Though the mother's DCF service plan required her to obtain appropriate housing, she was unable to do so.

Evidence of alcohol or drug abuse is also relevant to a parent's willingness, competence, and availability to provide care. *Care & Protection of Frank*, 409 Mass. 492, 494 (1991). In this case, the mother admitted to cocaine and marijuana use at least twice while pregnant with her second child, Evan. The drugs were provided by Marks. Where, as here, drug use was a factor contributing to established neglect, it is properly considered in a determination of unfitness.

Also properly considered is a psychologist's prediction that a child will regress if returned to the mother. See *Adoption of Frederick*, 405 Mass. 1, 8 (1989). As previously noted, Anton's therapist recommended reducing visits with the mother because of Anton's regression and need for days of recuperation after those visits. Anton showed minimal affection toward the mother during her visits.

3. *Services directed at reunification.* For the first time on appeal, the mother claims that DCF failed to provide adequate services prior to proceeding to terminate parental rights. We disagree. The first two service plans were directed at reunification and multiple services were offered to the mother, including

parenting classes, individual counselling, psychological evaluations, and visitation. Moreover, "a parent must raise a claim of inadequate services in a timely manner so that reasonable accommodations may be made." *Adoption of Gregory*, 434 Mass. 117, 124 (2001). The mother did not do so here.

*Conclusion.* For the reasons stated above, we affirm the decree entered by the Juvenile Court on April 26, 2007, finding the mother unfit and dispensing with her consent to adoption.

*So ordered.*