This is an appeal from the decision of the Juvenile Court finding by clear and convincing evidence that the mother, Anderson's father, and John's father were currently unfit, and that the best interests of Anderson (born in 2006) and John (born in 2013) warranted the termination of all three parents' parental rights. Anderson's father is currently incarcerated for sexually molesting and raping the mother's eldest child. He is classified as a level three sex offender and is set to be released from prison in 2045. He does not appeal.
Both the mother and John's father, whom we will refer to hereafter as "father," do appeal. The mother refuses to leave the father, her husband, also a level three sex offender, and, as a consequence, these appeals both turn primarily on the father's risk of reoffense.
Under our case law, in determining the risk of reoffense, the judge may take account of the father's status as a level three sex offender, as the judge did here, and of his failure to complete treatment. See Adoption of Anton, 72 Mass. App. Ct. 667, 674 (2008). "As a level three sex offender, [the father] has been determined by law to present a high risk of reoffense and dangerousness." Id. at 673-674. John's father had raped his daughter and had sexually abused her over a five-year period; he also sexually molested a friend of his daughter's. The offenses here were no older than the offenses at issue in Adoption of Anton, so the evidence is not stale. (And, we note that one can petition for reclassification, but that, at the time of trial, the father remained classified as a level three sex offender.)
As the judge found, the father has a significant history of sexual offenses against young children and a lengthy criminal record, which includes both sexual and nonsexual offenses. He had several open charges at the time of the trial in this case, including for failure to register as a sex offender. Though he participated in some sex offender treatment, he did not complete treatment, minimized his offenses, and "has a pattern of being deceitful to therapists, social workers and authorities." The mother, for her part, denied that the father committed the offenses, minimized the seriousness of the offenses, and was "[unable] to recognize and understand [the] risk [the father posed] to her children." The mother has a pattern of entering into relationships with sex offenders; indeed, "[a]ll four of [her] significant relationships have been with registered sex offenders." Even after the mother's daughter disclosed that Anderson's father had raped her, the mother chose to enter into a relationship with the father, another registered sex offender. This evidence, coupled with the father's level three status and high risk of reoffense, clearly and convincingly supports the judge's finding that both parents are unfit to parent the children.
The father contends that the reasons given by the judge for discrediting the father's expert's testimony contained errors. We think any error was immaterial as we read the judge to have said that, even accepting that expert's opinion, termination was appropriate. In that testimony, the expert made clear, repeatedly, that he was not saying there was a "low risk" of reoffense, but only a "relatively low" risk. We understand this distinction to mean that the only evidence in the record, even accepting this expert's testimony as correct, is that the father presents something other than a "low risk" of reoffense. Consequently, we find no error in the judge's conclusion that, even accepting this expert's assessment, termination was proper.
Both parents argue for the first time on appeal that the father is less likely to reoffend against male children. This argument is waived. In any event, the evidence at trial provided proof of a risk of reoffense against any child, regardless of gender. Indeed, the father's own expert testified that he was not saying that there was any difference with respect to risk depending on the gender of possible future victims. He testified that, because the father had only female victims in the past, he was less likely to reoffend than if he had had male victims in the past. He testified, "[I]n [the father's] case, his victims were females, and not males. Therefore he would be considered less at risk." The judge interrupted him saying, "You say 'less at risk' to offend against a male child?" The expert responded, "No. In general. His overall risk --." Beyond that, the father himself testified, in fact, that girls had been his "main" focus. He did not testify that girls had been his exclusive focus. The evidence in the record demonstrates that the father was not a "low risk" with respect to all children. There is nothing in the record to indicate that the father's risk of reoffense was "low" with respect to boys (but otherwise with respect to girls).
The mother also argues that any risk to the children is diminished because she was "sufficiently protective in the past when her daughter was sexually abused by another man" (i.e., Anderson's father). The judge rejected this argument, finding that, although the mother promptly reported the abuse to the police when her daughter disclosed it, the fact that it had been happening for six years undermines the mother's claimed ability to protect her children from sexual predators in the home. This finding is not clearly erroneous.
Finally, John raises objections to the visitation order. He argues that postadoption visits with the parents are not in his best interests. Because John did not file a notice of cross appeal, these arguments are not properly before us. We note however that the judge ordered posttermination visitation with the biological parents, not postadoption visitation. The court-ordered visitation thus will terminate upon John's adoption, and any question of parental visitation will then be within the complete discretion of the adoptive parents.[3] See Adoption of Jacques, 82 Mass. App. Ct. 601, 605, 610 (2012) (distinguishing between posttermination and postadoption visitation).
The judge also ordered regular visitation between John and "his siblings." The judge said, "[A]ny adoptive resource for each sibling shall continue said visitation provided therapists for each child continue to find said contact in the best interest of each child." John notes, among other things, that he "is not acquainted with [Anderson], who is struggling with his own issues of manifesting highly sexualized conduct with other children." John argues that "[c]ertainly any such arrangements are best left to the discretion of the" adoptive parents and notes that "the adoption plan that was submitted by [the Department of Children and Families] made no mention of postadoption visitation."
Again, in the absence of a cross appeal we are without jurisdiction to address John's concerns. However, it is clear that the order with respect to sibling visitation also applies only to posttermination, not postadoption, visitation. It is placed in the same paragraph following the sentence describing posttermination visitation with the biological parents. Because it refers to "any adoptive resources," by its terms it can only apply prior to adoption. At the point of adoption, the adoptive parents are no longer an "adoptive resource"; they are the child's parents. Furthermore, the order indicates that therapists for each child are to determine whether visitation is in each child's best interests during the period when the visitation order is in effect; it would be odd to interpret this to apply to a child after he is adopted and his best interests can be protected by his new parents.
Further, if John objects to posttermination sibling visitation, although we do not have an appeal before us, he would have standing to file a motion in the trial court to reopen that aspect of the decision. See Adoption of Garrett, 92 Mass. App. Ct. 664, 679 n.25 (2018) ("the children have a statutory right to petition the Juvenile Court under G. L. c. 119, § 26B(b ), if they are dissatisfied with the state of visitation"). If, as appears to be the case, such visitation was ordered without notice, John's due process rights to notice and an opportunity to be heard with respect to his best interests may be implicated and the burden would properly be placed in any such proceeding on the party seeking to impose the visitation requirement.
Decrees affirmed.

The judge approved the adoption plan of the Department of Children and Families for John, which was adoption by his current foster family, with whom he has lived since July of 2014.