NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-866

CARE AND PROTECTION OF WAYLON (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial in the Juvenile Court, a judge adjudicated the mother unfit to parent Waylon (born in 2013) and Peter (born in 2017), awarded permanent custody of Waylon to his father, and awarded permanent custody of Peter to his father. The mother appeals, arguing that the Department of Children and Families (department) failed to meet its burden of proving her to be unfit, failed to make reasonable efforts to reunify the family before removing the children, and that her constitutional rights were violated. We affirm.

Background. 1. History with the department. We summarize the facts as found by the judge, supplemented by uncontroverted facts from the record. The mother and Waylon's father met in 2010 and began dating. When Waylon was born in 2013, they lived

_____

[1] Care and Protection of Peter. The children's names are pseudonyms.

together in Boston.  Their relationship lasted until 2015, and they coparented Waylon from 2013 to 2015.  During that time, Waylon's father was incarcerated twice, and the mother moved twice, ultimately residing in Dorchester, where she met Peter's father in 2014.  The mother and Peter's father lived together briefly in Brockton following Peter's birth in 2017.  Within a few months, however, Peter's father moved out of the Brockton apartment.

The department first became involved with the family in 2013 due to allegations of domestic violence between the mother and Waylon's father in the presence of Waylon.[2]  In 2015, the department filed a care and protection petition based on concerns of neglect of Waylon by the mother and his father.  Temporary custody was awarded to the mother before the petition was ultimately dismissed in 2016.

In 2017, the department received a report pursuant to G. L. c. 119, § 51A (51A report), alleging neglect of Waylon by the mother.  The report alleged that the mother repeatedly left Waylon unattended in the hallway when dropping him off at day care and that Waylon was frequently picked up late.

---

[2] Waylon's father has a lengthy criminal record, and there were previous incidents of domestic violence between him and the mother.  While incarcerated, Waylon's father participated in domestic violence and batterer's courses, and at the time of trial, the department had no current concerns about domestic violence by him.

Additionally, a teacher assisting Waylon in the bathroom observed dried feces stuck to his genitals, legs, and socks.

In November 2019, the mother and the two children moved into a maternal aunt's apartment. The mother and the children slept on an air mattress on the floor of the living room. On June 16, 2020, the department received three 51A reports alleging neglect of Waylon and Peter by the mother. On that date, Peter's father had gone to the apartment to check on the children due to his concerns that the mother had left the children home alone in the past. When he told the mother that he was going to check on the children, she responded that Peter did not need to be picked up, and she wanted Peter to remain with Waylon. However, she sent a text message while Peter's father was on his way, asking him to check on the children. He entered the unlocked apartment and found the children alone in an unsanitary apartment with rodent feces, trash, and urine stains on the floor. Additionally, there was moldy food in the kitchen, and the bathtub and bathroom were stained with dirt and grime.

Peter's father called 911 upon his arrival, and emergency medical services and the police responded to the home. The mother was not present while emergency personnel were at the home. Waylon and Peter were transferred to a local hospital, where emergency response workers from the department interviewed

3

them as well as the mother and Peter's father.  Waylon told the department that the mother had left him alone in the past when she went to work.[3]  Peter's father reported that this was the second time he had found the children alone while in the mother's care, and he showed photographs he had taken two to three weeks prior depicting trash and rodent feces on the floor of the home.  He also reported that Peter had bite marks on his cheek, which he believed were from mice.

Upon questioning by the department, the mother denied that she had left the children alone and told the department that she left them in the care of their maternal uncle.  The mother was unable to provide a clear explanation for where the maternal uncle was during the emergency response at the home.  Initially, she stated that he smoked on the porch every thirty minutes but then told the department that sometimes he smoked on a bench away from the home, so he may not have heard the emergency personnel arrive.  The judge did not credit the mother's testimony that she left the children in the care of the maternal uncle, because the uncle was not present when Peter's father arrived and did not return to the apartment until sometime later.

---

[3] The judge considered statements made by the children not for the truth of the matter, but for the children's state of mind.

A seventy-two hour hearing was held on June 22, 2020, and a different judge found that exigent circumstances justified the children's removal and that the department made reasonable efforts to avoid removal. The department was granted temporary custody of both children. The department placed Peter with his father. The department initially placed Waylon in a foster home, and then with his father in New Jersey in December 2020 after an Interstate Compact on the Placement of Children (ICPC) was approved. A trial was held in May 2021. On November 3, 2021, the judge entered judgments finding the mother unfit to care for the children and adjudicated the children in need of care and protection. Permanent custody of each child was granted to his father. The mother's parental rights were not terminated. The mother timely appealed.

2. Mother's mental health. Throughout her involvement with the department, the mother made multiple statements that raised concerns about her mental health. The mother told the department that Peter's father made the June 16, 2020, 51A reports as retaliation for the mother's choice to be celibate in their relationship, and that he was sleeping with the children's maternal aunt. In August 2020, the mother told a court investigator that she moved to Rhode Island because she believed Peter's father was trying to kill her. She also reported that he broke into her home and had obtained her computer passwords

5

and deleted records concerning discoveries she had made about him. Additionally, the mother reported that he would come to her home at 2 A.M. and kick in her window to see Peter. The mother made similar statements during parenting classes, which the class facilitator found concerning. The judge did not credit the mother's accusations against Peter's father and found them to be indicative of her poor mental health.

The mother exhibited inappropriate behavior during virtual visits with Waylon in 2020, which included telling him not to trust anyone in his foster home. Additionally, a discussion between the mother and Waylon about his desire to live with his father made Waylon so upset that he ran out of the social worker's car and into the street. During a virtual visit in September 2020, the mother told Waylon, "I know people are trying to kill me, but I am not going anywhere. I know they're trying to kill us."

The mother vacillated between denying that she had a mental illness and informing the department that she was receiving treatment but refusing to sign a release of information to confirm treatment and permit review of her treatment records. Although the mother's action plan required her to seek mental health treatment, the department was unable to confirm her participation. The mother refused to undergo a neuropsychological evaluation at the request of the department

6

because she did not believe that she had a mental illness. Later at trial, however, the mother testified that she did undergo an evaluation but was unable to provide the results to the department. Despite reporting that she did not have a mental illness, the mother also informed the department that she had participated in therapy from September 2020 to February 2021, she but refused to sign a release of information. She later testified that she no longer attended sessions because her therapist informed her that she no longer required therapy.

3. Child care plans. At the time of trial, Waylon's New Jersey social worker had conducted monthly visits and found that Waylon had his own bedroom in his father's apartment and a good relationship with his stepmother, whom his father married in 2021. Since moving to New Jersey, concerns that the department had about Waylon's mental and behavioral health resolved. Additionally, at the time of trial, Waylon and his father were working with a family therapy team that was assisting his father in accessing additional community resources for Waylon.

At the time of trial, Peter's father had been employed as a bus driver for seven years. He was sharing a two-bedroom apartment in outside of Boston with his brother, and Peter had his own bed. While living with his father, Peter received early intervention services until he aged out of the program. Peter's

father testified that he planned to seek additional services for a speech impediment identified when Peter began preschool.

After the children were removed from her care, the mother moved to an apartment in Rhode Island. During a virtual tour, the department observed the apartment to be safe and clean. However, the mother was unable to articulate a suitable care plan for the children, and her testimony shifted depending on the question being asked. For example, the mother stated that she could not visit Waylon in New Jersey because she did not have a reliable car, but she later testified that she did have a functioning car for use in her child care plan. The judge did not credit the mother's testimony on this issue, as she found it evolved significantly when the mother was questioned, suggesting that she did not have a plan.

Discussion. 1. Current parental unfitness. Without challenging any specific findings, the mother contends that the evidence does not clearly and convincingly support the judge's conclusion that she is unfit to parent Waylon and Peter.[4]

_____

[4] The judge issued ninety-four detailed findings of fact and thirty-seven conclusions of law. Although the mother did not challenge any specific finding as being clearly erroneous, she argues that the maternal uncle's arrival before the children were removed on June 16, 2020, "cast[s] doubt on the idea that they were home alone." The judge did not credit the mother's testimony that the maternal uncle was supervising the children because he failed to present himself when emergency personnel initially responded to the home and did not appear until sometime later. See Petition of the Dep't of Social Servs. to

"Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008). A finding of parental unfitness must be supported by clear and convincing evidence. See Adoption of Katharine, 42 Mass. App. Ct. 25, 27 (1997).

Here, the judge's subsidiary findings were "proved by a preponderance of the evidence," establishing by clear and convincing evidence that the mother was unfit. Adoption of Anton, 72 Mass. App. Ct. at 672. The judge properly considered past instances of neglect, including the 51A report filed by the employees at Waylon's preschool, in concluding that the mother was unfit at the time of trial. See Adoption of Carla, 416 Mass. 510, 517 (1993) (prior history may be considered for prognostic value); Adoption of Diane, 400 Mass. 196, 204 (1987) ("judge could properly rely upon prior patterns of ongoing, repeated, serious parental neglect . . . in determining current unfitness"). The record amply demonstrates that the mother failed to provide the children with adequate adult supervision, which was evident when emergency personnel arrived at the apartment in June 2020 and found the children, who were two and

Dispense with Consent to Adoption, 397 Mass. 659, 670 (1986) ("judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference" [citation omitted]).

9

seven at the time, home alone in a filthy apartment.  See

Adoption of Daniel, 58 Mass. App. Ct. 195, 202 (2003).  See also

Care & Protection of Three Minors, 392 Mass. 704, 713 n.11

(1984) (appropriate for judge to consider cleanliness of living

conditions in consideration of fitness).

The mother's undiagnosed and untreated mental health issues

were also a relevant consideration for the judge.  See Adoption

of Luc, 484 Mass. 139, 146-147 (2020) (failure to recognize need

for or to engage consistently in treatment is relevant to

determination of unfitness).  The mother's repeated contentions

that she feared Peter's father was trying to kill her, as well

as her inappropriate comments to Waylon, are indicative of her

poor mental health.  The mother's refusal to adhere to the

department's action plan resulted in her mental health

challenges remaining undiagnosed and untreated.  See id. at 146

n.17 ("Here, the concern for the child is not that the mother

has mental health challenges, but that those challenges remain[]

largely unaddressed, and even unacknowledged").  The nexus

between the mother's mental health and her fitness as a parent

was evident in Waylon's reactions to his virtual visits with the

mother.  See Adoption of Querida, 94 Mass. App. Ct. 771, 777

(2019) ("mother's inappropriate behavior at visits [was]

directly related to her fitness").  See also Care & Protection

of Bruce, 44 Mass. App. Ct. 758, 761 (1998) (when past conduct

10

predicts future parenting ability, judge not required to wait for disaster to happen).  Overall, the mother's refusal to engage with services, as outlined by her action plan, affected her ability to be a fit parent.  See Adoption of Luc, supra at 147.

2.  Best interests.  "At the core of the [parental fitness] inquiry is the question of what is in the best interests of the child[ren]."  Adoption of Katharine, 42 Mass App. Ct. at 28.  The judge's findings that Waylon and Peter's best interests would be served by granting permanent custody to their respective fathers were supported by clear and convincing evidence.  The judge found that both homes were safe and adequate for the children, and both children were receiving necessary services.  Waylon's mental and behavioral health had improved since his placement with his father, and Peter had received early intervention services.  Both children were adequately supervised by qualified adults before and after school.

In contrast, the mother repeatedly denied that she had left the children alone in the past and was unable to articulate a suitable care plan for the children.  The judge was particularly concerned that the mother refused to acknowledge the flaws in her initial child care plan, finding that her lack of understanding suggested she would likely repeat the behaviors

11

that led to the filing of 51A reports.  See Care & Protection of Bruce, 44 Mass. App. Ct. at 761.  The evidence supports the judge's conclusion that the best interests of the children would be served by granting permanent custody to their respective fathers based on the stable and safe environments that the fathers were able to provide and the mother's lack of insight regarding proper child care.  See Adoption of Lisette, 93 Mass. App. Ct. 284, 296-297 (2018).

3.  Other claims.  The mother argues that the department did not make reasonable efforts at reunification.  However, because the mother failed to raise this in the Juvenile Court and did not file an abuse of discretion motion, it is waived on appeal.  See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020).  The mother also argues, for the first time on appeal, that the entry into her home by Peter's father and the photographs that he took depicting the conditions where the children lived violated her rights under the Fourth Amendment to the United States Constitution.  Because the mother did not raise this claim below, it cannot be raised for the first time on appeal and is therefore waived.  See Boss v. Leverett, 484

12

Mass. 553, 562-563 (2020) ("issues not raised below cannot be argued for the first time on appeal").

Judgments affirmed.

By the Court (Blake, Grant & Smyth, JJ.[5]),

*Joseph F. Stanton*

Clerk

Entered:  May 9, 2023.

---

[5] The panelists are listed in order of seniority.