NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-975

ADOPTION OF OPAL[1] (and two companion cases[2]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the mother unfit to parent Opal, Nisa, and Tessy and terminated her parental rights.[3] The mother appeals, contending that the judge abused his discretion by relying on clearly erroneous findings and conclusions of law regarding domestic violence in the parents' relationship, her housing instability, and her mental health concerns. We discern no abuse of discretion or error of law, and affirm.

Background. The mother and father were in a relationship for approximately fourteen years. The oldest child was born in June 2011. When the family resided in Rhode Island, Rhode Island's Department of Children, Youth, and Families removed her

---

[1] A pseudonym.
[2] Adoption of Nisa and Adoption of Tessy, both pseudonyms.
[3] The father stipulated to the termination of his parental rights and waived his right to appeal.

twice, in November 2011 and December 2012, due to substance abuse concerns and unsanitary conditions in the home.

The family came to the attention of the Massachusetts Department of Children and Families (DCF) in April 2014, when the middle child was born substance exposed and DCF received G. L. c. 119, § 51A, reports (51A reports) that the mother tested positive for illicit substances during her pregnancy. DCF subsequently opened a case for services. Between 2017 and 2018, DCF received multiple additional 51A reports alleging neglect of the two older children, including both parents' overdoses. The mother had overdosed after dropping off the children at daycare, and police discovered her unresponsive in her car. DCF also found that the parents were not engaging in services with providers. At the conclusion of its investigation in October 2018, DCF removed the two older children from their parents' care and filed a care and protection petition. Following this removal, the middle child reported to the court-appointed investigator that it makes her sad when her parents fight, and when asked what her parents do when they fight, she responded: "Daddy hit mommy. Daddy yells, mommy doesn't. Sometimes mommy hits."

Four months after the two older children returned to their parents' care, in December 2019, DCF became involved with the

2

family again when they got into a car accident.[4]  At the time of the accident, the mother was pregnant with the youngest child, and the two older children were not in car seats.[5]  Police found in the car drug paraphernalia, including a metal spoon and syringe, and prescription medication, which the mother admitted she was not taking as prescribed and was sharing with the father.

In March 2020, the youngest child was born substance exposed.  The family had been residing in a home in Ashland owned by the mother's family.  DCF informed the parents multiple times that the father should not be in the home until he completed a long-term treatment program for substance abuse.  Based on continuing concerns about the parents' substance abuse, their inaccurate reporting to DCF, and the father's unpermitted presence in the home, DCF removed all three children in April 2020 and filed a second care and protection petition.

---

[4] The precise circumstances of the accident were somewhat unclear.  A DCF social worker reported that (i) the parents provided "inconsistent information regarding which adult had been operating the vehicle," (ii) the mother identified herself as the driver, and (iii) the parents "eventually explained that [the father] drove the vehicle at the time that the accident occurred, but that [the mother] moved to the driver's seat after the accident happened."  The trial judge found that the "parents were inconsistent in their account of the incident regarding who was driving"; and that the mother "claimed she was driving the vehicle" and that she "hit a pole and totaled the front of the vehicle."

[5] As a result of the accident, the mother was charged with child endangerment.  The charge was later dismissed.

Between October 2020 and January 2021, the mother was repeatedly hospitalized or in residential treatment programs. In October 2020, the mother entered a residential treatment program but was terminated the same day when she left and did not return after a visit to the hospital. She then entered a second residential treatment program, Hart House, in November 2020. Twice in December 2020, during meetings at Hart House, the mother and her social worker discussed domestic violence concerns in the parents' relationship. In the second meeting, the mother disclosed a history of domestic violence in their relationship, including physical, verbal, and emotional abuse. At trial, the mother denied physical abuse by the father but testified that they verbally and emotionally abused each other.

In January 2021, Hart House terminated the mother from its program after she got into an altercation with another client. The mother refused a referral to a third residential treatment program. Following her eviction from the Ashland home in February 2021, the mother stayed at a sober house for approximately a week, and then moved into a friend's house for approximately another week. After a brief hospitalization, she returned to the friend's house, where she remained through trial. As the mother had been unwilling to provide information about her residence to her social worker, DCF did not know her whereabouts until trial.

4

Discussion.  "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilian, 91 Mass. App. Ct. 727, 729 (2017), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).  "We give substantial deference to the judge's decision to terminate parental rights 'and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Talik, 92 Mass. App. Ct. 367, 370 (2017), quoting Adoption of Ilona, supra.  "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

1.  Domestic violence.  "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children, Custody of Vaughn, 422 Mass. 590, 595 (1996), and instances of such familial violence are compelling evidence for a finding of parental unfitness."  Adoption of Talik, 92 Mass. App. Ct. at 374.  "A judge may properly consider

5

a parent's decision to remain in a relationship with an abusive partner in determining parental fitness." Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021).

The record supports the judge's findings and conclusions regarding domestic violence in the parents' relationship. During a meeting with her social worker at Hart House, the mother disclosed a history of domestic violence with the father, including physical, verbal, and emotional abuse. The mother further testified at trial that she and the father verbally and emotionally abused each other. In addition, the middle child reported to the court-appointed investigator that when the parents fought, the father "hit" the mother and yelled, and the mother "[s]ometimes . . . hits" as well.

The judge found it particularly concerning that the mother remained involved with the father, despite her own recognition of their relationship as unhealthy and disruptive to her stability. Indeed, the mother allowed the father in the home when she knew her DCF action plan forbid him from returning until he completed a substance abuse treatment program, and the parents were "always together" according to their social workers, contrary to the mother's consistent assertions to the social worker who assumed the family's case in December 2020 that she had ended her relationship with the father.

Based on the reports of domestic violence from both the mother herself and the middle child and the mother's inability to distance herself from the father whom she disclosed as her abuser, the judge appropriately considered the issue of domestic violence in making his determination as to the mother's fitness.[6]

2. Housing instability. The inability to secure "adequate stable housing" is properly considered in determining a parent's unfitness. Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008). See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987). Moreover, "it is proper for a judge to consider a parent's living arrangements at the time of trial despite the fact that the child was not living with her at that time." Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018).

The evidence supports the judge's conclusion that the mother lacked stable housing. At the time of the children's final removal, the mother was residing in the Ashland home. She subsequently attempted to participate in two residential treatment programs but left one program on the first day and did

_____

[6] The mother also takes issue with the judge's finding that the mother did not engage in domestic violence treatment, pointing to the absence of such treatment requirement in her DCF action plan. While the mother is correct that DCF did not add domestic violence treatment to her action plan, the judge did not significantly rely on the mother's failure to engage in such treatment to draw his conclusions about domestic violence in the parents' relationship.

not return and was terminated from the second for not following program rules; the mother also refused a referral to a third program. After her eviction from the Ashland home, the mother stayed at a sober house for a week, then moved in with a friend. As the mother had been unwilling to inform her social worker, DCF learned of her present living situation only at trial and was not able to conduct home visits until then. See Adoption of Yvonne, 99 Mass. App. Ct. 574, 581 (2021) (judge properly considered housing instability where DCF was "unable to verify the mother's living situation or to conduct home visits"). The judge also found that the mother had no concrete plans for acquiring adequate and permanent housing if she were to be reunified with her children. At trial, the mother gave unclear and inconsistent testimony regarding how long she planned to stay with her friend.[7] There was, thus, ample evidence to support the judge's conclusions about the mother's housing instability.

3. Mental health. "Mental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's

---

[7] The mother initially testified that she would stay with her friend for six months to a year or a year and a half. She subsequently testified that she and her friend agreed on three months. The judge found her testimony about her housing "vague and confusing."

8

special needs" (emphasis deleted).  Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989).  Failure by the parent to recognize the need for or to engage consistently in mental health treatment is relevant to a determination of unfitness.  See Adoption of Luc, supra; Adoption of Eduardo, 57 Mass. App. Ct. 278, 281-282 (2003).  A trial judge is permitted to use "past conduct, medical history, and present events to predict future ability and performance as a parent."  Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

The mother does not challenge the judge's findings and conclusions regarding her substance abuse but challenges those about her mental health, arguing that there was no nexus between her mental health diagnoses and her ability to parent.  The record, however, indicates that her substance abuse and mental health issues were closely related, and supports the judge's conclusion that her failure to address her mental health issues directly contributed to her inability to parent her children.

The mother was diagnosed with attention deficit disorder or attention deficit hyperactivity disorder, anxiety and panic disorders, and schizotypal disorder.  Her mental health challenges led to multiple hospitalizations, including one for a suicide attempt after taking twenty to thirty tablets of Xanax in November 2020 and for severe depression and suicidal

9

ideations after relapsing on fentanyl in March 2021. DCF offered services to address these challenges, but the mother did not consistently engage in therapy or counseling, complete or provide neuropsychological and medication evaluations, and sign releases for DCF to speak with her providers.

The record further supports that the mother's failure to address her mental health issues and misuse of prescribed and nonprescribed substances "interfered with her ability to assume parental responsibilities." Adoption of Jacob, 99 Mass. App. Ct. at 265. When the mother hit a pole while driving and totaled the front of the car, she was pregnant with the youngest child, the two older children were not in car seats, and police found in the car drug paraphernalia and prescription medication, which the mother admitted she was not taking as prescribed and was sharing with the father. While in the mother's care, the oldest child's school attendance and punctuality were inconsistent. In addition, after DCF took custody of the children, the mother failed to consistently visit them, not visiting in person from November 2020 to March 2021, canceling visits last minute, and missing scheduled phone calls. Based on this evidence, the judge appropriately considered the mother's mental health concerns in determining unfitness.

Though the record supports the judge's findings and conclusions on domestic violence in the mother's relationship

with the father, her housing instability, and her mental health concerns, taken as a whole, we note as well that the judge's decision did not rely heavily on those shortcomings. Instead, the mother's unresolved substance abuse, which the mother does not challenge, was at the center of the judge's determination of her unfitness. The mother had an extensive history of substance abuse and did not consistently participate in treatment to address this problem. DCF removed the children from her care multiple times due to substance abuse and overdose concerns among others. The mother's housing instability was also in part a consequence of her discharge from residential treatment programs.

Conclusion. The judge did not err in considering evidence of domestic violence in the mother's relationship with the father, her housing instability, and her mental health concerns, in reaching his conclusion that the mother is unfit. In any event, the judge did not rely solely or even principally on those factors; he properly considered, among other additional factors, the mother's substance abuse issues and inconsistent engagement with services, both of which the mother does not challenge. We conclude that the judge did not abuse his discretion in finding the mother unfit, or in concluding

11

termination of the mother's parental rights to be in the best interests of Opal, Nisa, and Tessy.

<u>Decrees affirmed</u>.

By the Court (Green, C.J.,
Desmond & Hodgens, JJ.[8]),

*Joseph F. Stanton*

Clerk

Entered:  October 19, 2023.

---

[8] The panelists are listed in order of seniority.