NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-280

CARE AND PROTECTION OF QUIKA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge adjudicated the mother unfit to parent Quika, awarded permanent custody of Quika to the Department of Children and Families (department), but did not terminate the mother's parental rights.  The mother appeals, arguing that the department failed to meet its burden and failed to make reasonable efforts to reunify her with the child, and that the judge abused his discretion in giving too much weight to the child's wishes.  We affirm.

Background.  We summarize the facts as found by the judge, all which find ample support in the record.  Quika was born in 2008 and lived with her mother at her maternal grandmother's home for about two years.  She then lived with her father for less than a year before returning to her maternal grandmother's

_____

[1] A pseudonym.

home for about four years (the mother lived there with them for two of the four years). When Quika was about eight years old, she moved in with the mother and the mother's partner, Susan.[2] During that first year, the mother's stepfather died, and then Quika's father died. Quika's maternal grandmother died later that same year, followed by Quika's great-grandparents. Quika was close to these relatives and "fell apart" soon after their deaths.

In November 2018, the department received a report, pursuant to G. L. c. 119, § 51A (51A report), alleging that the mother had overdosed on prescription medication. Another 51A report was filed in May 2019, alleging that the mother, who was on probation, was facing incarceration due to a positive drug screen.[3] During a visit with a department worker, Quika indicated that she felt "so-so" safe with her mother. Another 51A report was filed in June 2020, after the mother was involved in a physical altercation in public, while Quika was nearby. The mother was arrested and charged with assault and battery by means of a dangerous weapon; the charges were subsequently dismissed.

---

[2] A pseudonym.

[3] The mother was released from custody after five days.

2

In January 2021, the mother and Susan reported to the department that Quika was "defiant, lied, stole, and had punched" the mother. Susan stated that she "smacked" Quika in response, but that she had not hit her before that. The mother and Susan also disclosed that they used the basement, which did not have access to the apartment, both as a place for Quika to wait until an adult came home and as a place of punishment.

In March 2021, a 51A report was filed alleging that the mother had hit and screamed at Quika and accused her of stealing. Quika reported that she thought of killing herself for "a while," fueled by her poor relationship with her mother. The same day, the mother brought Quika to the emergency room as Quika was experiencing suicidal ideation and planned to run away. At the hospital, Quika reported that her mother and Susan called her derogatory names, and she had made multiple suicide attempts. After another 51A report was filed, on March 11, 2021, the mother left Quika at the hospital, and the department took custody of her. Following her release from the hospital, Quika was placed in foster care where she resided at the time of trial.

After Quika's removal, the mother went to a substance misuse treatment program in western Massachusetts where she remained upon her discharge (notwithstanding that Quika lived in the eastern Massachusetts). Although the mother had a history

3

of mental health and substance misuse issues, at the time of trial, she appeared clean and sober. After Quika's removal, the mother only had two in-person visits with her, but they kept in contact through telephone calls and text messages. Quika did not want in-person visits with the mother and expressed a desire not to return to live with her.

Discussion. 1. Current fitness. The mother contends that the evidence does not support the judge's conclusion that she is unfit. "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008). In care and protection cases, the judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous. See Custody of Eleanor, 414 Mass. 795, 799 (1993); Care & Protection of Laura, 414 Mass. 788, 793 (1993). "Taken together, these findings must then prove clearly and convincingly that the parent[] [is] currently unfit to provide for the welfare and best interests of the[] child[]." Adoption of Quentin, 424 Mass. 882, 886 (1997).

Here, the judge's subsidiary findings were "proved by a preponderance of the evidence," and considered together, established by clear and convincing evidence that the mother was unfit. Adoption of Anton, 72 Mass. App. Ct. at 672-673. The

4

judge found that the mother-daughter relationship was "profoundly dysfunctional" at the time of removal, that "no work ha[d] been done . . . to build a healthier relationship", and that the mother was not currently able to help Quika manage her emotions. The mother showed "no insight" into why the relationship had deteriorated "or what she would do differently if [Quika] were returned to her custody." See Adoption of Ilona, 459 Mass. 53, 62 (2011) ("lack of significant improvement" in mother's parenting and "continued failure to come to grips with the problems in her relationship with her daughter" supported finding of unfitness); Adoption of Holly, 432 Mass. 680, 690 (2000).

The judge found that Quika was "verbally disparaged and smacked; that is, she was abused." The judge properly considered that "a child who has been either the victim or the spectator of [physical] abuse suffers a distinctly grievous kind of harm." Custody of Vaughn, 422 Mass. 590, 595 (1996).[4]

The judge also considered the mother's infrequent visitation with Quika which is relevant evidence of unfitness. See Adoption of Talik, 92 Mass. App. Ct. 367, 373 (2017). The mother was also inconsistent in meeting with the department; the

---

[4] Although the judge did not conclude that the use of the basement for punishment was abusive, he noted that this means of punishment "illustrate[d] the need of [the mother] to learn more effective means" to control Quika's behavior.

5

case worker had been unable to schedule a home visit with her for months.  See Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) ("Evidence of parents' refusal to cooperate with the department . . . is relevant to the determination of unfitness").

The judge properly considered the mother's neglect of Quika's educational needs.  The mother and Susan did not allow Quika to use a computer for remote learning on Wednesdays because they distrusted Quika's use of technology.  Quika missed all her Wednesday classes as a result.  When Quika came into the department's custody, an individualized education plan was updated and implemented for her, as there were gaps in Quika's education.  See Care & Protection of Lillith, 61 Mass. App. Ct. 132, 135 (2004) (mother's failure to send child to school and inability to understand negative effects of such failure were relevant factors in establishing unfitness).  See also G. L. c. 119 § 24.

2.  Child preference.  The mother also argues that the judge improperly based his finding of unfitness on Quika's expressed preference.  Although a child's wishes "are entitled to weight in custody proceedings," Care & Protection of Georgette, 439 Mass. 28, 36 (2003), they are not dispositive. Here, the judge properly considered Quika's expressed desire to

remain in her current placement, but this desire did not underpin the judge's conclusion that the mother was unfit.

3. Best interests. "At the core of the [parental fitness] inquiry is the question of what is in the best interests of the child." Adoption of Katharine, 42 Mass App. Ct. 25, 28 (1997). The judge's findings that Quika's best interests would be served by granting permanent custody to the department were well supported. Quika's early childhood had been marked by "a great deal of instability," followed by the instability of removal. The mother "did not appear able to offer a specific or realistic plan" for where Quika would live or go to school if Quika were returned to her care. Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001). The judge found that if Quika returned to the mother, it would cause further instability, whereas Quika "is now in a placement that can care for her long term." This was a proper consideration. See Adoption of Nancy, 443 Mass. 512, 517 (2005) ("Stability in the lives of children is important"); Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 136 (1990) (discussing importance of stable home environment).[5]

---

[5] We note the "significant difference . . . between an award of custody in a care and protection proceeding, which primarily addresses only current fitness and is reviewable every six months . . . and the 'extreme step' of terminating the parent and child's legal relationship." Adoption of Carlos, 413 Mass. 339, 350 (1992). Here, the mother retains "residual rights," as her parental rights were not terminated. Care & Protection of Thomasina, 75 Mass. App. Ct. 563, 569-570 (2009) (comparing

4.  Reasonable efforts.  The mother also argues that the department failed to make reasonable efforts to reunite the family by failing to promote visitation and family therapy. "[T]he department must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents." Adoption of Ilona, 459 Mass. at 60, citing Adoption of Leonore, 55 Mass. App. Ct. 275, 278 (2002).  It is also "well-established that a parent must raise a claim of inadequate services in a timely manner."  Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), citing Adoption of Gregory, 434 Mass. 117, 124 (2001). Here, the mother raised this issue for the first time at trial. See Adoption of West, 97 Mass. App. Ct. 238, 244 (2020).  The judge nevertheless considered the department's efforts to promote visitation and family therapy and ordered the department to increase those efforts.  The judge did not make findings about the reasonableness of these efforts, but he did determine that transferring custody to the department was in Quika's best interests, based on his overall assessment of the evidence.  See Adoption of Ilona, 459 Mass. at 61 (even where department has not made "reasonable efforts," judge may issue appropriate order conducive to child's best interests).

_____

"residual rights of parents" in care and protection proceedings with termination of parental rights).

8

Finally, the judge did not improperly base his determination of parental unfitness on the mother's lack of visitation, as the record demonstrates that the mother's unfitness, as addressed <u>supra</u>, was based on a "constellation of facts."  <u>Adoption of Greta</u>, 431 Mass. 577, 588 (2000).

<u>Judgment affirmed</u>.

By the Court (Blake, C.J.,
Shin & Hand, JJ.[6]),

Clerk

Entered:  January 15, 2025.

---

[6] The panelists are listed in order of seniority.